In the Matter of the ARBITRATION BETWEEN: TRANS CHEMICAL LIMITED, Petitioner,

AND

CHINA NATIONAL MACHINERY IMPORT AND EXPORT CORPORATION, Respondent.

Civil Action Nos. H–95–4114, H–95–5553, H–96–0166.

United States District Court, S.D. Texas, Houston Division.

July 7, 1997.

Ronald D. Secrest, Beck, Redden and Secrest, Kenneth L. Rothey, Kenneth L. Rothey & Associates, Houston, TX, for petitioner.

Edward J. Murphy, Bell & Murphy, Bell & Murphy, Houston, TX, Robert E. Campbell, Cadwalader, Wickersham & Taft, Los Angeles, CA, for respondent.

### MEMORANDUM AND ORDER

LAKE, District Judge.

This consolidated action involves efforts by the successful party in an arbitration to enforce the award in the face of challenges by the unsuccessful party to the court's jurisdiction and the validity of the arbitration award.

### I. Background

In 1987 two United States citizens, Dr. Shardar Khan and Dr. Mohammed Halipoto, both emigrants from Pakistan, decided to build the first hydrogen peroxide plant in Pakistan. They contacted a number of companies who might actually build the plant. One of the companies was China National Machinery Import and Export Corporation ("CNMC"). In September of 1987, when it became apparent that an agreement might be reached, Drs. Khan and Halipoto formed Trans Chemical Limited ("TCL"), a Pakistani corporation, and the subsidiary of United International ("UI"), an American corporation owned by the doctors.[1] CNMC engaged N.E.M., Inc., as its agent in the United States to negotiate with TCL. On December 22, 1987, after weeks of negotiation, TCL and CNMC signed a contract in which TCL

---

1. Transcript of arbitration hearing at Vol. I, pp. 44–47; at Vol. III, pp. 1–46.

agreed to purchase and CNMC agreed to sell a complete hydrogen peroxide plant and related technical services.[2] The 1987 contract was amended in December of 1988.[3] Both the original and amended contracts provided for binding arbitration of disputes between the parties in Houston, Texas, in accordance with the procedures of the American Arbitration Association ("AAA").[4]

Disputes between the parties soon arose. TCL claimed that CNMC had failed or refused to provide the goods and services required under the contracts and that CNMC had made material misrepresentations in connection with the sale, construction, and operation of the hydrogen peroxide plant. CNMC claimed breach of contract, fraud in the inducement, and trade libel.[5] Pursuant to the arbitration clause in the contracts the parties submitted their disputes to arbitration conducted by the AAA in Houston. A panel of three arbitrators heard evidence from June 21, to July 10, 1995. On August 15, 1995, the Panel awarded TCL $9,447,-563.62.[6]

### A. Civil Action No. H–95–4114

On the day of the award TCL filed an original Petition to Confirm Arbitration Award in this court, alleging subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1605. TCL later amended its petition to also seek enforcement of the award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9; the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), and its implementing legislation, 9 U.S.C.

§ 207; and the Texas General Arbitration Act ("TGAA"), Tex.Rev.Civ. Stat. Ann. art. 236.[7] CNMC filed a Motion to Dismiss TCL's Amended Petition to Confirm Arbitration Award and a Motion to Vacate Arbitration Award, Subject to the Motion to Dismiss.[8]

At a January 26, 1996, hearing the court ruled that additional discovery was appropriate regarding TCL's failure to produce a feasibility study about hydrogen peroxide production in Pakistan until the morning of the arbitration.[9] The court also ordered further briefing and discovery addressing the court's subject matter jurisdiction. The parties filed supplemental briefs on these issues and also filed various objections to each other's filings, which the court denied.[10] TCL also filed a Motion for Sanctions.[11]

Pending before the court in Civil Action No. H–95–4114 are TCL's Amended Petition to Confirm Arbitration Award, Motion for Order Confirming Arbitration Award and for Entry of Judgment, and Motion for Sanctions and CNMC's Motion to Dismiss TCL's Amended Petition to Confirm Arbitration Award, Motion to Vacate Arbitration Award, and Motion to Continue Discovery.

### B. Civil Action No. H–95–5553

On October 20, 1988, Dr. Halipoto and his wife, Zareen Halipoto, filed a Voluntary Petition for Bankruptcy under Chapter 11 in the Bankruptcy Court for the Southern District of Texas.[12] On June 1, 1995, as the date for arbitration approached, CNMC filed an adversary proceeding in the Halipoto bankrupt-

2. 1987 contract, Exhibit A to TCL's Amended Petition to Confirm Arbitration Award, Docket Entry No. 11 in Civil Action No. H–95–4114.

3. 1988 contract, Exhibit B to TCL's Amended Petition to Confirm.

4. Article 20 to the contracts.

5. Amended Position Paper of Respondent CNMC Before the AAA, Exhibit 3 to TCL's Response to CNMC's Motion to Vacate, Docket Entry No. 18.

6. Award of Arbitrators, Exhibit E to TCL's Amended Petition to Confirm.

7. TCL's Amended Petition to Confirm Arbitration Award, Docket Entry No. 11.

8. Docket Entry Nos. 12–14.

9. Transcript of January 26, 1996, hearing at pp. 28–35, Docket Entry No. 40.

10. Docket Entry No. 80.

11. Docket Entry No. 79.

12. Docket Entry No. 1 to *In re Halipoto*, Bankr. No. 88–08633–H5–11.

cy case.[13] CNMC sought a declaration that (1) the arbitration involved property of the Halipoto bankruptcy estate, (2) TCL/UI, Dr. Halipoto, and/or Dr. Khan exercised unauthorized control over such property of the bankruptcy estate, and (3) the arbitration clause in the 1988 contract was obtained by fraud or fraud in the inducement because of the pending bankruptcy and was therefore void or voidable.

On June 9, 1995, CNMC filed an Emergency Motion for Temporary Restraining Order with the bankruptcy court alleging that the pending arbitration set for June 21, 1995, was stayed by the bankruptcy petition and requesting a TRO to prevent the arbitration from proceeding as scheduled.[14] At a hearing held the same day Bankruptcy Judge Karen Brown denied the request for a TRO.[15] On June 14, 1995, the Bankruptcy Trustee filed an Answer to CNMC's Complaint[16] and an Emergency Motion for TRO seeking the same relief sought earlier by CNMC.[17] On June 15, 1995, Judge Brown again denied the motion.[18] On September 21, 1995, the Trustee and TCL filed a Joint

Motion to Withdraw Reference in the adversary proceeding,[19] which was granted on December 8, 1995.[20] The case as assigned Civil Action No. H–95–5553[21] and was consolidated with Civil Action No. H–95–4114.[22]

Pending before the court in the adversary action are TCL's Motion for Sanctions Against CNMC and its Counsel,[23] CNMC's Motion to Dismiss the Trustee's Claim for Confirmation of the Arbitration Award,[24] CNMC's Motion to Reconsider and Vacate Order Entered September 22, 1995,[25] the Motion to Dismiss of the Khans filed on September 15, 1995,[26] the Motion to Dismiss of United International filed on September 18, 1995,[27] CNMC's Motion to Dismiss TCL's First Amended Cross–Claim,[28] CNMC's Motion to Vacate Arbitration Award,[29] CNMC's Motion to Extend Scheduling Deadlines,[30] and CNMC's Objections and Motion to Strike TCL's Evidence.[31]

**C. Civil Action No. H–96–0166**

On November 13, 1995, while Civil Action No. H–95–4114 was pending, CNMC filed an

13. Joint Original Complaint of CNMC and N.E.M., Inc. for Declaratory Relief, Docket Entry No. 1 to *China National Machinery Import & Export Corporation, et al. v. Mohammed Halipoto, et al.*, Adversary No. 95–4383. As discussed more fully *infra*, at part V.A.2.b. of this Memorandum and Order, CNMC had filed a "Suggestion of Bankruptcy and Notice of Stay of Arbitration Proceedings" with the arbitration panel the previous day, May 30, 1995. (Exhibit 37 to Exhibit Vol. 1 to CNMC's Motion to Vacate, Docket Entry No. 14 in Civil Action No. H–95–4114) On June 9, 1995, the arbitrators ruled that the arbitration would proceed as scheduled. (June 9, 1995, letter from AAA to All Parties, Exhibit 39 to Exhibit Vol. 1).

14. Docket Entry No. 3 to Adversary No. 95–4383.

15. Docket Entry No. 4 to Adversary No. 95–4383.

16. Docket Entry No. 5 to Adversary No. 95–4383.

17. Docket Entry No. 6 to Adversary No. 95–4383.

18. Docket Entry Nos. 10–11 to Adversary No. 95–4383.

19. Docket Entry No. 36 to Adversary No. 95–4383.

20. Docket Entry No. 2 to *In re Halipoto (Hensley v. Halipoto, et al.)*, Civil Action No. H–95–5553.

21. See Docket Entry No. 4 in Civil Action No. H–95–5553.

22. Docket Entry No. 22 in Civil Action No. H–95–4114.

23. Docket Entry No. 28 in Adversary No. 95–4383.

24. Docket Entry No. 34 in Adversary No. 95–4383.

25. Docket Entry No. 41 in Adversary No. 95–4383.

26. Docket Entry No. 31 in Adversary No. 95–4383.

27. Docket Entry No. 32 in Adversary No. 95–4383.

28. Docket Entry No. 55 in Adversary No. 95–4383.

29. Docket Entry No. 60 in Adversary No. 95–4383.

30. Docket Entry No. 1 in Civil Action No. H–95–5553.

31. Docket Entry No. 5 in Civil Action No. H–95–5553.

Original Petition to Vacate Arbitration Award in the 190th District Court of Harris County, Texas, seeking vacatur under the TGAA, the FAA, and the New York Convention.[32] TCL removed the case to federal court pursuant to 28 U.S.C. § 1441(b), alleging federal subject matter jurisdiction over CNMC's claims under the FAA and the New York Convention, and CNMC filed a Motion to Remand. The case was consolidated with Civil Action No. H–95–4114.[33] Pending before the court in the removed action are CNMC's Original Petition to Vacate Arbitration Award[34] and CNMC's Motion to Remand.[35]

## II. *Subject Matter Jurisdiction*

Because the court cannot address the merits of this case unless it has subject matter jurisdiction, the court must first address CNMC's jurisdictional challenges in Civil Action No. H–95–4114. *See Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir. 1994). TCL alleges that the court has jurisdiction to confirm the arbitration award: (1) under the FSIA because CNMC is an "agency or instrumentality of a foreign state" and is subject to the Act's exceptions to sovereign immunity; (2) under the New York Convention; and (3) under federal bankruptcy law. CNMC responds that the court should dismiss this action for lack of jurisdiction because (1) it is not an agency or instrumentality of a foreign state within the meaning of the FSIA; (2) the New York Convention does not provide for enforcement of an arbitral award rendered in the United States under American arbitration rules; and (3) CNMC dismissed the bankruptcy action before service by an adverse party of a responsive pleading, or alternatively, the adversary action should be dismissed since the arbitration claims predominate over the ownership claims.

## A. **Standard of Review**

■ Federal courts are courts of limited jurisdiction and possess power only over cases authorized by the Constitution and laws of the United States. *Coury v. Prot,* 85 F.3d 244, 248 (5th Cir.1996). The burden of establishing jurisdiction rests with the party alleging it. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376–78, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). In ruling on a motion to dismiss for lack of subject matter jurisdiction the court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996).

■ In this case the court will use the third approach. In doing so the "court is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue." *Moran,* 27 F.3d at 172. When the court bases its decision on its resolution of disputed facts it must give the plaintiff an opportunity for discovery and a hearing that is appropriate to the nature of the motion to dismiss. *McAllister v. FDIC,* 87 F.3d 762, 766 (5th Cir.1996); *Delgado v. Shell Oil Co.,* 890 F.Supp. 1315, 1322 (S.D.Tex.1995). The court's authority to consider evidence beyond the complaint allows it to devise a procedure that may include permitting affidavits, allowing further discovery, hearing oral testimony, and conducting an evidentiary hearing, all limited to deciding the jurisdictional issue. *Moran,* 27 F.3d at 172. *See also Coury,* 85 F.3d at 248. To evaluate CNMC's status as an agency or instrumentality of the People's Republic of China the court has fashioned a comprehensive discovery plan permitting affidavits, reports, deposition testimony, and extensive briefing on Chinese law and CNMC's status under that law. Although the court may consider oral as well as written evidence, an

---

32. Exhibit A to TCL's Notice of Removal, Docket Entry No. 1 in Civil Action No. H–96–0166.

33. Docket Entry No. 48 in Civil Action No. H–95–4114.

34. Exhibit A to Docket Entry No. 1 in Civil Action No. H–96–0166.

35. Docket Entry No. 7 in Civil Action No. H–96–0166.

evidentiary hearing is not required. In light of the extensive discovery and briefing on the jurisdictional issues, an evidentiary hearing is unnecessary in this case.

In determining Chinese law the court is not bound by the evidence presented by the parties or by the Federal Rules of Evidence. Pursuant to Fed.R.Civ.P. 44.1 "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."

> Rule [44.1] permits the court to consider any material that is relevant to a foreign-law issue, whether submitted by counsel or unearthed by the court's own research, and without regard to its admissibility under the rules of evidence.
>
> \* \* \* \* \* \*
>
> Since the new Rule dissipates former inhibitions, the court may consider any material the parties wish to present. Statutes, administrative material, and judicial decisions can be established most easily by introducing an official or authenticated copy of the applicable provisions or court reports supported by expert testimony as to their meaning ... In addition to primary materials and expert testimony, a litigant may present any other information concerning foreign law he believes will further his cause, including secondary sources such as texts, learned journals, and a wide variety of unauthenticated documents relating to foreign law.

Arthur R. Miller, "Federal Rule 44.1 and the 'Fact' Approach to Determining Foreign Law: Death Knell for a Die–Hard Doctrine," 65 *Mich. L.R.* 613, 656–57 (1967) (footnotes omitted). *See also Atwood Turnkey Drilling v. Petroleo Brasileiro, S.A.,* 875 F.2d 1174, 1176 (5th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *Republic of Turkey v. OKS Partners,* 146 F.R.D. 24, 27 (D.Mass.1993).

■ Under Rule 44.1 expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is determined. *See Republic of Turkey,* 146 F.R.D. at 27 (citing cases); 9 C. Wright & A. Miller, *Fed. Prac. & Proc.* § 2444, at p. 646. An expert witness on foreign law is not required to meet any special qualifications and need not be admitted to practice in the country whose law is at issue. *See* 9 C. Wright & A. Miller, *supra,* at p. 646. Differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact under Rule 56. *Banco de Credito Indus., S.A. v. Tesoreria General,* 990 F.2d 827, 838 (5th Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994); John R. Brown, "44.1 Ways to Prove Foreign Law," 9 *Mar. Law.* 179, 194 (1984).

■ Although expert testimony is the most common way to determine foreign law, it is no longer "an invariable necessity in establishing foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." *Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.), *aff'd mem.,* 633 F.2d 203 (2d Cir.1980) (citing Pollack, "Proof of Foreign Law," 26 *Am. J. of Comparative L.* 470, 474 (1978) (listing authorities)). The Advisory Committee Notes to Rule 44.1 state that the Rule

> provides that in determining [foreign] law the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail. On the other hand, the court is free to insist on a complete presentation by counsel.

Rule 44.1, Advisory Committee Notes. *See also* 9 C. Wright & A. Miller, *supra,* at p. 646. In making its determination of foreign law the court may rely on foreign case law decisions, treatises, and learned articles, even if they are not generally admissible under

the Federal Rules of Evidence. *Republic of Turkey*, 146 F.R.D. at 27 (citing cases).[36]

## B. Jurisdiction Under the Foreign Sovereign Immunities Act

The FSIA is an enigmatic legislative creation, described by the Fifth Circuit as " 'remarkably obtuse' " and a " 'statutory labyrinth that, owing to the numerous interpretive questions engendered by its bizarre provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary.' " *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1107 (5th Cir.1985) (quoting *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1105, 1106 (S.D.N.Y.1982)). This case underscores the accuracy of the Fifth Circuit's lament.

The FSIA provides that "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Under 28 U.S.C. § 1330(a) "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). "Sections 1604 and 1330(a)

work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989) (emphasis in original).

TCL alleges that CNMC is an "agency or instrumentality of a foreign state" within the meaning of the FSIA. 28 U.S.C. § 1603 provides a detailed definition of an "agency or instrumentality of a foreign state:"

(a) A "foreign state," except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

TCL bears the burden of showing jurisdiction under the FSIA.[37]

The parties do not dispute that CNMC satisfies the first and last elements of

---

**36.** Although there is no requirement that the court give formal notice to the parties of its intention to engage in its own research on an issue of foreign law that has been raised by them, or of its intention to raise and determine independently an issue not raised by them, if the court discovers material "diverging substantially" from that offered by the parties or if it plans to utilize foreign law in a way not contemplated by the parties it should inform them of this and give them an opportunity to react to the court's research. Rule 44.1, Advisory Committee Notes; 9 C. Wright & A. Miller, *supra*, at pp. 649–650. Although the court conducted a limited independent inquiry into Chinese law, it did not discover any material diverging substantially from that offered by the parties nor will it utilize Chinese law in a way not contemplated by the parties.

**37.** Relying on *Arriba Ltd. v. Petroleos Mexicanos (Pemex)*, 962 F.2d 528, 533–34 (5th Cir.), *cert.*

denied, 506 U.S. 956, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992), CNMC argues that TCL bears the burden of proving that CNMC was an agency or instrumentality of China under a heightened alter ego theory of agency. CNMC confuses two separate uses of "agency" law under the FSIA. As the Fifth Circuit explained in *Hester International Corp. v. Federal Republic of Nigeria*, 879 F.2d 170 (5th Cir.1989),

The use of the single term "agency" for two purposes in the context of this case may cause some confusion. The FSIA uses it to determine whether an "agency" of the state may potentially qualify for foreign sovereign immunity itself under the FSIA. This is a completely different question from that which we must address here: whether or not the [Grains Production Company, Limited, of Nigeria (NGPC)] enjoyed an alter ego relationship with the Federal Republic of Nigeria so that it

§ 1603(b). CNMC is a corporation organized under the laws of the People's Republic of China ("China") and is not a citizen of a State of the United States or created under the laws of a third country.[38] Their dispute focuses on the second element. CNMC argues that after its 1992 corporate reorganization it is no longer state-owned by the Chinese government as required by § 1603(b)(2). CNMC also argues that the court should require TCL to prove, pursuant to *Edlow Int'l v. Nuklearna Elektrarna Krsko (NEK)*, 441 F.Supp. 827 (D.D.C.1977),[39] that CNMC discharges a governmental function or that the Chinese government exercises direct control over CNMC's operations in a manner indicating that it owns a controlling interest in CNMC.

### 1. *Is CNMC owned by China?*

The parties argue that the court must first decide the proper date on which CNMC's status as an agency or instrumentality of the Chinese government should be determined. Although the parties agree that the determination of whether CNMC is subject to the court's jurisdiction under the FSIA should be based upon CNMC's status at the time the act or acts complained of occurred,[40] they disagree as to that time. TCL argues that the acts complained of occurred in 1987 and 1988 when the contracts were entered and when CNMC was indisputably an agency or instrumentality of the Chinese government. CNMC responds that the act complained of occurred on August 15, 1995, when the arbitrators entered the award in favor of TCL, and a cause of action to confirm the award accrued. Alternatively, CNMC argues that the acts complained of occurred no earlier than August of 1993, the earliest date on which TCL argued during arbitration that its causes of action for breach of contract and

could bind Nigeria to a contract. Although such an alter ego relationship may be described in terms of "agency," it is a completely different inquiry than that which might be conducted under § 1603. As shown *infra*, the level of state control required to establish an "alter ego" relationship is more extensive than that required to establish FSIA "agency." For instance, mere state majority ownership [which existed in *Hester* and *Arriba*] "would not create an alter ego relationship." 879 F.2d at 176–77 n. 5.

**38.** Articles of Association of CNMC, Exhibit 4–E to CNMC's Supplemental Brief on Jurisdictional Issues, Docket Entry No. 69; Business License of CNMC, Exhibit 4–F to CNMC's Supplemental Brief on Jurisdictional Issues.

**39.** In *Edlow* a Bermudian nuclear fuels broker sued NEK, "an independent self-managing organization of workers linked in labour by common interests and organized in basic organizations of associated labour" chartered by the Socialist Federal Republic of Yugoslavia to build and operate a nuclear power plant, to resolve a dispute over NEK's obligation to pay the broker its fee. 441 F.Supp. at 831. NEK argued that the court lacked subject matter jurisdiction over the action because it was not a foreign state within the meaning of 28 U.S.C. § 1603(b). The broker countered with the sole argument that NEK met the § 1603(b)(2) test because Yugoslavia "owned" NEK by virtue of the country's socialist political ideology that "all property under a socialist system ... is subject to the ultimate ownership and authority of the state." In rejecting that argument the court stated that

to accept plaintiff's argument on this point would be to characterize virtually every enterprise operated under a socialist system as an instrumentality of the state ... [While the FSIA's] legislative history evinces Congress' intent that the definition of "agency or instrumentality of a foreign state" be read broadly to encompass "a variety of forms, ..." there is no suggestion that a foreign state's system of property ownership, without more, should be determinative on the question whether an entity operating within the state is a state agency or instrumentality under the [FSIA].

*Id.* at 831–32 (citation omitted). Faced with both a political system that forbade private enterprise and a dearth of evidence with which to distinguish state-owned from privately held enterprises the court was forced to improvise. It developed the test that CNMC now asks this court to apply—a test designed to determine whether NEK met the first § 1603(b)(2) criteria because it was an "'organ' of the Yugoslav government" that discharged a governmental function, or whether it met the second criteria because the Yugoslav government actually exercised control over its operations in a manner indicating that it owned a controlling interest in the organization. *Id.* at 832. Since the court concluded that NEK met neither of § 1603(b)(2)'s criteria it held that NEK was not a foreign state within the meaning of § 1603(a).

**40.** *See Delgado v. Shell Oil Co.*, 890 F.Supp. 1324, 1340 n. 33 (S.D.Tex.1995) (citing *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 449–50 (6th Cir.1988), and *General Electric Capital Corp. v. Grossman*, 991 F.2d 1376, 1380–82 (8th Cir.1993)).

fraud accrued, and one year after CNMC reorganized in 1992. The court need not resolve this conflict, however, because the court concludes that CNMC was an agency or instrumentality of the Chinese government in 1987 and remained one through 1995.

### a. CNMC's arguments and evidence

CNMC admits that under Chinese law it is "owned by the whole people" of China and that before 1992 this meant that it was owned by the Chinese state. CNMC argues, however, that in 1992 in accordance with the 1988 Law of the People's Republic of China on Industrial Enterprises Owned by the Whole People (the "Industrial Enterprises Law"), it was restructured into an enterprise whose ownership rights vest in CNMC and the "whole people of China" in a system of "social ownership" similar to that discussed in *Edlow*.[41] CNMC offers the testimony of Professor Rui Mu and Zhang Baolong in support of its interpretation of the relevant Chinese laws and regulations that control the relationship between CNMC and the Chinese government.[42]

### i. The testimony of Professor Rui Mu [43]

Professor Rui states that from 1949 to 1979 concepts of property ownership in China were very simple. All property could be classified as government owned and controlled or privately owned and controlled. Beginning with the economic reforms of 1979, however, these distinctions became blurred. The economic reforms created a "new property ownership system based on management rights. In other words, property management rights in China are now the equivalent of property ownership rights in the United States." [44] Article 71 of the Chinese Civil Law enacted in 1986 provides that "property ownership refers to rights of an owner, according to the law, to possess, use, reap benefit from and dispose of his own property." There are four basic rights associated with property ownership in China: (1) possession, (2) use, (3) benefit, and (4) disposition.[45] Under Article 2 of the 1988 Industrial Enterprises Law, enterprises such as CNMC are granted three of the four property ownership rights created by Article 71 of the Civil Law. ("An enterprise shall enjoy the right to possess, use, and legally dispose of property which the state has authorized it to operate and manage.") The remaining right, the right to benefit from the property, is "clearly dealt with" in Article 3 of the 1988

---

**41.** Telephone Deposition of Rui Mu at pp. 45–47, 119–25, Exhibits 2–3 to CNMC's Supplemental Brief on Jurisdictional Issues, Docket Entry No. 69; Affidavit of Zhang Baolong (Zhang Affidavit II) at ¶ 5, Docket Entry No. 62.

**42.** See Report of Professor Rui Mu, Exhibit 4 to CNMC's Supplemental Brief on Jurisdictional Issues; Rui Deposition, Exhibits 2–3 to CNMC's Supplemental Brief and Exhibit F to TCL's Supplemental Brief on Jurisdictional Issues, Docket Entry No. 64; Affidavit of Zhang Baolong (Zhang Affidavit I), Exhibit A to CNMC's Motion to Dismiss, Docket Entry No. 12; Zhang Affidavit II, Docket Entry No. 62; Telephone Deposition of Zhang Baolong, Exhibit 1 to CNMC's Supplemental Brief and Exhibit B to TCL's Supplemental Brief.

CNMC's additional reliance on United States Department of Commerce ("DOC") findings regarding the tariff rates to be charged against various Chinese state-owned enterprises accused of dumping goods in the United States is misplaced. In an effort to ensure fair trade the DOC may impose duties or tariffs on merchandise "dumped" into the United States market at below cost prices by a foreign corporation. *See* 19 U.S.C. § 1671. The DOC's analysis of the status of a Chinese enterprise is limited to an individual

enterprise's independence from the Chinese government in its export activities. *See* 61 Fed.Reg. 65527, 65528, 1996 WL 713116, at *3 (Dec. 13, 1996); 61 Fed.Reg. 14057, 14058, 1996 WL 139290, at *2–3 (March 29, 1996). The DOC does not analyze issues of ownership or broader government control over an enterprise. Moreover, the DOC held in December of 1996 that CNMC had not attempted to show that it was free from government control in its export activities for purposes of receiving a separate tariff rate from the single rate assigned to Chinese "government-controlled enterprises." *See* 61 Fed.Reg. 65527, 65544–45, 1996 WL 713116, at *37–39 (Dec. 13, 1996).

**43.** Professor Rui is a licensed attorney, a professor of law at Peking University, and director of the International Economic Law Institute at Beijing University. He specializes in civil law, international private law, international commercial law, and civil procedure and has served or currently serves on numerous Chinese legal or foreign trade councils and commissions. (Rui Report at 1–2)

**44.** Rui Report at 5.

**45.** Rui Report at 5.

Industrial Enterprises Law, which provides that "the primary task of an enterprise shall be to develop commodity production, create wealth, increase savings, and satisfy the ever-growing material and cultural needs of society, in accordance with state plans and market demands." The right to benefit from property is "vested in the Chinese society, or, in other words, all of the people of China."[46] Rui states that CNMC is entitled to the benefits of its business activities subject to its obligation to pay taxes and to meet certain minimum government requirements such as for funding workers' benefits and for future development of the business through minimum levels of profit reinvestment.[47]

> In essence, the economic reforms in China have established a new system of property management rights, thereby effectively creating three broad types of property:
> 1. government property, which relates to property which is owned by the whole people but is managed and controlled by the government;
> 2. social property, which is owned by the whole people but is managed and controlled by private enterprise; and
> 3. private property, which is owned, managed, and controlled privately.[48]

Because of "the historical context" government property and social property are often referred to as "state-owned" property. Rui concludes that industrial enterprises like CNMC are not state owned or controlled but, instead, are "socially owned" and privately controlled:

> Thus, at least from the Chinese perspective, "state-ownership" is tied to the fact that the property is ultimately owned by all of the people of China, and has no relationship whatsoever to who actually manages and controls (i.e., possesses, uses, and disposes of) that property for the ben-

efit of its ultimate owners, the whole people of China. Therefore, the most accurate description of [CNMC], which is an organization operating consistent with the Industrial Enterprises Law that has absolute management rights over the property under its control, is that it is a socially owned organization, whose assets are neither government owned nor controlled.[49]

According to Rui, this social ownership is analogous to the concept of social ownership discussed in *Edlow*, where property was being held in trust for the benefit of society but was otherwise owned and operated by a commercial entity.[50]

In the final part of his report Professor Rui discusses numerous elements of the reformed Chinese laws that give industrial enterprises greater operational and managerial freedom to set prices, sell or purchase materials and goods related to any legitimate business activity, import and export goods and services, invest funds and manage their own bank accounts, consolidate and merge, contract with employees and with other legal persons (domestic and foreign), make loans and act as a guarantor, and declare bankruptcy.[51]

### ii. The testimony of Zhang Baolong

CNMC argues that it does not meet either of the two tests outlined in *Edlow* and offers Zhang Baolong as its primary witness on CNMC's status under *Edlow*. Zhang, who is currently an in-house attorney for CNMC,[52] states that CNMC is not an organ of the Chinese government because it does not perform any strictly governmental function.[53] Zhang also states that the Chinese government does not exercise management control over CNMC.[54] Zhang explains that (1) CNMC is legally distinct from any national, state, or local government and receives no

---

46. Rui Report at 6.

47. Rui Report at 5–6; Rui Deposition at 92–93.

48. Rui Report at 6–7.

49. Rui Report at 7.

50. Rui Deposition at 45–47, 119–25.

51. Rui Report at 8–14; Attachments H–Q to Rui Report.

52. Zhang Affidavit II at ¶ 1.

53. Zhang Deposition at 72–75.

54. Zhang Deposition at 24–25, 37, 41–43, 47, 49–50, 64–65, 68–72, 79–80, 83, 88–93, 99–101, 106–16, 119, 122; Zhang Affidavits I & II.

subsidies from any government entity; (2) beneficial ownership of the enterprise vests in all the people of China; (3) CNMC's is a profit-making business entity whose profits are reinvested in the company; (4) CNMC's only payments to governmental entities are generally applicable corporate taxes; (5) CNMC's only connection to the government is the requirement that it report various matters to the Ministry of Foreign Trade and Economic Cooperation; and (6) CNMC hopes soon to join other industrial enterprises that have made public securities offerings in recent years.[55]

### b. TCL's arguments and evidence

TCL argues that CNMC is an agency or instrumentality of the Chinese government because it is wholly owned by the state. TCL offers the testimony and accompanying exhibits of Professor Donald C. Clarke and Minkang Gu in support of its position.[56]

### i. The testimony of Professor Donald C. Clarke[57]

Professor Clarke states that CNMC is owned by the Chinese state. CNMC was founded in 1950 with funds invested by the state, and Clarke found no evidence that any non-state entity has made any equity investment in CNMC since its inception. In China investment confers ownership rights. "Consequently, the most realistic way to view [CNMC] is as a wholly-owned subsidiary of the Chinese state, the state being represented by the State Council delegating its power to the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC")."[58]

Clarke states that CNMC's claim that it is not owned by the state is not sustainable. CNMC concedes that its assets were owned by the government before the current economic reforms. According to Clarke, the argument that "ownership by the whole people" is somehow different from "state ownership" after 1988 has no basis in fact or in Chinese law or legal theory and lies in the realm of abstract political theory. Article 7 of the Chinese Constitution equates "ownership by the whole people" with "state ownership" when it speaks of "the state-owned economy, i.e., the economy under the socialist system of ownership by the whole people . . . ." Article 5 of the 1994 PRC Regulations Governing the Supervision and Management of State–Owned Enterprises' Property provides: "Enterprise property is owned by the whole people, that is, owned by the state." Finally, Article 41 of the 1992 PRC Regulations on the Transformation of the Management System of Enterprises states: "The assets of the enterprise are under ownership by the whole people, i.e., ownership by the state. The State Council exercises the right of ownership over enterprise assets on behalf of the state." The state is, therefore, declared to be the owner of industrial enterprises like CNMC; and the State Council, an identifiable government body, is declared to be the body that exercises the right of ownership on behalf of the state.[59]

The Chinese state has broad ownership rights. Under Article 41 of the 1992 Regulations state-owned industrial enterprise assets include assets invested in the enterprise by the state in various forms and the return on those assets. Enterprise profits thus belong to the government, not to the enterprise itself. That the government allows some profits to remain in the enterprise in no way negates its claim to receive them at will. Article 42 of the 1992 Regulations makes it clear that governmental departments in

---

55. Zhang Affidavits I & II; Zhang Deposition at 43, 49–50, 64, 106–07, 119, 122.

56. See Transcript of Deposition of Donald C. Clarke, Exhibit A to TCL's Supplemental Brief on Jurisdictional Issues, Docket Entry No. 64; Report of Donald C. Clarke, Exhibit A to Vol. I of Exhibit 1 to Clarke Deposition, Docket Entry No. 65; Transcript of Deposition of Minkang Gu, Exhibit H to TCL's Supplemental Brief; Report of Minkang Gu, Attachment 2 to Exhibit 1 to Gu Deposition, Docket Entry No. 67.

57. Donald C. Clarke is a professor at the University of Washington School of Law, and is currently on leave to work as an attorney for Paul, Weiss, Rifkind, Wharton & Garrison. He speaks and reads Chinese fluently, and has an academic specialization in Chinese law with an emphasis on the legal regime of economic reform. (Clarke Report at 1–2; Exhibit A–2 to Clarke Report)

58. Clarke Report at 3.

59. Clarke Report at 6.

charge of an enterprise have the right to decide how enterprise profits shall be allocated between the government and the enterprise.[60]

Clarke states that Professor Rui's theory of "social ownership" of industrial enterprises is not supported by Chinese law. Article 3 of the Industrial Enterprises Law, where Professor Rui discovers his social ownership concept, is a weak basis on which to ground a theory of meaningful ownership by "society," given the explicit legal declarations to the contrary. Furthermore, Clarke concludes that Professor Rui's theory has no support in any legislative texts, Communist Party pronouncements, or even speculative academic articles. Legal theories about property are of immense importance in Marxist theory, and the absence of Professor Rui's "social ownership" concept in Chinese legal thought is telling.[61]

Clarke believes that his conclusion that "owned by the whole people" really means "state ownership" is also supported by examining whether the concrete rights held by state bodies over industrial enterprises and their management and assets resemble indicia of ownership. According to Clarke, a common index of ownership is "who gets paid if a state-owned enterprise is sold, merged, or liquidated." Under Article 42(5) of the 1992 Regulations if CNMC were sold, merged, or liquidated, the government department in charge would take the assets, not CNMC's employees or "society as a whole." Furthermore, while the state devolves management power to industrial enterprise managers under the 1988 Industrial Enterprises Law and related regulations, it insists that important decisions be cleared with the governmental body in charge. Thus, Article 3(2) of the 1992 Regulations specifies that the purpose of the reforms of enterprise management systems is the protection of the state's ownership of the enterprise's assets. Article 15 of the Regulations delegates authority to enterprises to sell ordinary fixed assets, while retaining authority to control sales of major fixed assets. Income from these assets must be reinvested in the enterprise. Article 33 of the Regulations provides that if the enterprise experiences heavy losses in its business operations, it may apply to its government department for permission to cease production.[62]

Clarke also states that Chinese governmental bodies continue to exercise a great deal of control over other aspects of industrial enterprises. The presence of a Communist Party cell in each enterprise, mandated by Article 5 of the 1992 Regulations, allows for Party control over the enterprise. MOFTEC influences the selection of the enterprise manager through Communist Party channels and through its direct legal authority under Articles 42(6) and 44 of the Enterprises Law and Article 13 of the 1994 Regulations to appoint and remove the manager. Article 14 of the Procedures for the Registration and Management of State Asset Property Rights of Enterprises provides that if enterprise managers commit certain offenses, they are subject to "disciplinary" sanctions imposed by the government department in charge of the enterprise. "[T]he fact that enterprise managers can be 'disciplined' by a government department necessarily implies that they are administratively part of that department and subordinate to its leadership."[63]

Clarke concedes the correctness of statements in Professor Rui's report and Mr. Zhang's affidavit that CNMC has "separate legal status" and various associated characteristics. Clarke states, however, that an industrial enterprise's

> separate legal personality in no way prevents it from being owned by the state any more than it prevents it from being owned by any person. Thus, while it may be true, for example, that "[n]o laws or regulations permit a Chinese governmental entity to declare bankruptcy," the point is that there *is* a law that permits state-owned entities to declare bankruptcy—the 1986 Enterprise Bankruptcy Law—so th[e]

---

60. Clarke Report at 7–8.

61. Clarke Report at 9–12.

62. Clarke Report at 13–14.

63. Clarke Report at 20.

fact that [CNMC] can in theory declare bankruptcy does not prove that it is not a state-owned entity. Similarly, the fact that the Chinese government is not obliged to make good on its debts, as pointed out by Professor Rui in his report, again shows nothing more than that [CNMC] is a limited liability company. I know of no reason why the Chinese state cannot own a limited liability company.[64]

Clarke concludes that CNMC's "status is not really complicated; it is analogous to a limited liability company with a sole shareholder, the state, which allows the managers a certain degree of independence—indeed, probably more independence than it has granted its managers since the founding of the People's Republic of China—but nevertheless maintains, as it must, the right, *inter alia,* to change managers or discipline them for waste, as well as to decide on the allocation of the income stream and to benefit from the appreciation of the value of the enterprise." The Chinese State is thus the owner both in fact and in law.[65]

### ii. The testimony of Minkang Gu [66]

Gu states that there are three types of business ownership in China: (1) ownership by the whole people, (2) collective ownership, and (3) private ownership. The first two are considered to be the socialist public economy. Article 73 of the Civil Law states that "state property belongs to the whole people," which means that the property is retained by the state.[67] Under Article 2 of the Industrial Enterprises Law the property of an industrial enterprise belongs to the whole people. The state, based on the principle of separating ownership rights and operation rights, only grants an enterprise the power to operate and manage the property. The property remains owned by the state. The relationship between CNMC and the state is, therefore, "somewhat like the relationship between agent and principal." [68] The state treats state-owned property as "the material base of socialist public ownership and as the material base of the main source of state revenue," and uses the property to "promote socialist construction and reformation and to improve the People's material and cultur[al] life." [69] Gu concludes that Professor Rui's concept of "social property" is foreign to Chinese law.[70]

CNMC's goal of making a public securities offering in the future does not reflect a move towards privatization. Chinese leaders in charge of restructuring the economic system have made it clear that the development of the securities industry does not include the privatization of state-owned industrial enterprises. "In fact, China's government through its various ministries, maintains a controlling share in new ventures, and thereby is able to continue its control over the economy and business operations in China," and "regardless of how many shares [CNMC] may be allowed to sell to the public in the future, the State will remain the largest shareholder because it owns [CNMC's] property." [71]

Gu concludes that the state will not turn over its property ownership to CNMC "as long as the Chinese government wants to maintain a 'socialist public ownership economy' as stated in its Constitution." The 1992 reorganization of CNMC's business structure in a manner consistent with the Industrial

---

64. Clarke Report at 24. Clarke's analysis is accurate. In determining whether an entity is "an agency or instrumentality of a foreign state" the court's inquiry into the "separate legal status" of an entity is different from its inquiry into the "state's ownership interest" in the entity. *See* 28 U.S.C. § 1603(b)(1) & (2).

65. Clarke Report at 25.

66. Minkang Gu received his Bachelor of Law and Master of Law degrees from East China University of Politics and Law in Shanghai, and served as a lecturer in law there from 1987–1993. Between 1986 and 1988 Gu also main- tained a private general practice with a specialty in criminal law. Gu has published two articles on the recent reforms of corporate and securities law in China. (Gu Report at 1; Gu Deposition at 44–49)

67. Gu Report at 2.

68. Gu Report at 3.

69. Gu Report at 3.

70. Gu Report at 2.

71. Gu Report at 6.

Enterprises Law did not affect CNMC's status as an agency or instrumentality of China because CNMC's property is conferred by the state solely for operation and management, not ownership, purposes.[72]

### c. The court's analysis

■ CNMC admits that even after its reorganization in a manner consistent with the 1988 Industrial Enterprises Law, it is still "owned by the whole people."[73] CNMC argues, however, that its 1992 reorganization transformed this "ownership by the whole people" from "state ownership" to "social ownership," by which CNMC and all the people of China are the real owners of CNMC's assets. The court is not persuaded by this argument. Based upon its analysis of the evolution of state-owned industrial enterprises in China the court concludes that after 1992 CNMC remained a state-owned industrial enterprise at all times relevant to this case.

Most state-owned industrial enterprises were established in 1949 or soon thereafter. CNMC was established in 1950. Since then property rights over state-owned industrial enterprises (including ownership of and control over enterprise assets) have belonged to different levels of government.[74] Under the old planned economic system state-owned industrial enterprises were merely appendages of the government, with ownership and management rights to the enterprises belonging to the government.[75] Beginning in December of 1978, however, the Chinese government initiated a major program of reforms of state-owned industrial enterprises designed to separate government ownership and administration from enterprise management by granting expanded decision-making powers to enterprise managers.[76] The industrial enterprise system created by these ·reforms was designed to improve the efficiency of leading sectors of the Chinese economy while maintaining state ownership of industrial enterprise assets.[77] The reforms of state-owned industrial enterprises, though less far-reaching than in other sectors of the economy, have been significant.[78] The past two decades of reform have generated a measure of "price decontrol, limitation of state planning to a largely 'indicative' role, growing enterprise autonomy, and a series of contractual arrangements between the authorities and enterprises which embody significant efficiency incentives."[79] At the same time, however, there has been little reform of industrial enterprises with respect to enterprise ownership; industrial enterprises remain "overwhelmingly state-owned."[80]

The Chinese Constitution and statutory and regulatory law confirm the continued state ownership of industrial enterprises such as CNMC. The Constitution provides that "[t]he basis of the socialist economic system of the People's Republic of China is socialist public ownership of the means of production, namely, ownership by the whole people and collective ownership by the working people," Const., Art. 6, and that "[s]ocialist public property is sacred and inviolable." Const.,

**72.** Gu Report at 7.

**73.** Zhang Deposition at 157–58.

**74.** *See* Rui Report at 2–3, 5; Wallace Wen–Yeu Wang, "Reforming State Enterprises in China: The Case for Redefining Enterprise Operating Rights," 6 *J. Chinese L.* 89, 126 (1992).

**75.** Dai Yannian, "Spotlight on China's Modern Enterprise System," *Beijing Review*, Feb. 28– Mar. 6, 1994, at p. 4; Rui Report at 2–3, 5.

**76.** *See* Donald C. Clarke, "What's Law Got to do With It? Legal Institutions and Economic Reform in China," 10 *UCLA Pac. Basin L.J.* 1, 3–7 (1991).

**77.** *See* Yannian at 4 & 5; Clarke Report at 25; Gu Report at 3 & 7.

**78.** Donald Hay, et al., *Economic Reform and State–Owned Enterprises in China*, 1979–87, at 407 (1994).

**79.** Hay, et al., at 454–55; Rui Report at 3. By the end of 1993 China had 71,600 state-owned enterprises, or 19 percent of the total enterprises, which accounted for 53 percent of the country's total output value. Robert Art & Minkang Gu, "China Incorporated: The First Corporation Law of the People's Republic of China," 20 *Yale J. Int'l L.* 273, at Westlaw copy p. 3 (1995); Geng Yuxin, "Reform of State Enterprises to Enter New Stage," *Beijing Review*, Nov. 21–27, 1994, at 5.

**80.** *See* Hay, et al., at 411; Wang at 132–33.

Art. 12.[81] The Constitution defines three types of ownership:[82] (1) ownership by the whole people, or state ownership;[83] (2) collective ownership;[84] and (3) private ownership.[85] The first two types of ownership are considered to be the "socialist public economy,"[86] while the third is considered to be the private economy, which is "a complement to the socialist public economy." Const., Art. 11.[87]

The General Principles of Civil Law of the People's Republic of China (the "Civil Law") promulgated in 1986 established a systematic and comprehensive legal system.[88] The Civil Law "regulates property relations and personal relations between subjects of equal status—between citizens, between legal persons, and between citizens and legal persons,"[89] and creates four categories of civil rights: (1) "ownership and property rights related to ownership," (2) "obligations," (3) "intellectual property rights," and (4) "personal rights."[90] In line with the three basic forms of ownership provided for in the Constitution,[91] the system of ownership is divided into three categories: "ownership by the whole people," "ownership by collective organizations of the working masses," and "ownership by [private] citizens," individually or jointly. Civil Law, Arts. 73–75, 78. Article 71 of the Civil Law defines "ownership rights" as the rights "to possess, use, reap benefit from and dispose of" property.[92] The Civil Law also embodies the reform principle of separating state ownership of industrial enterprise assets from enterprise operation and management rights. A state-owned industrial enterprise has the right to "operate according to law *state property* that has been given to it to operate and manage." Civil Law, Art. 82 (emphasis added).

On April 13, 1988, the Chinese People's Congress passed the Industrial Enterprises Law. The law was intended to clarify the vague legal status of state-owned industrial enterprises and to provide legal protections for the operation and management rights created by the Constitution and Civil Law.[93] The Industrial Enterprises Law seeks to encourage management autonomy, while at the same time maintaining state ownership of enterprise assets. It does so by separating ownership rights from operation and management rights.

> The property of an enterprise shall belong to the whole people and shall be operated and managed by the enterprise with the authorization of the State, in accordance with the principle of separating ownership rights and management rights. An enterprise shall enjoy the right to possess, use and legally dispose of property which the State has authorized it to operate and

81. The Third Plenary Session of the 14th Chinese Communist Party Central Committee stated unequivocally: "The modern enterprise system with public ownership as a main body is the basis of the socialist market economy. "Quoted in *"RENMIN RIBAO* Examines State Enterprise Reform," *RENMIN RIBAO*, 28 Jan. 1995, at 10, *translated in* FBIS Daily Report, FBIS–CHI–95–031. *See also* Wang at 95; James V. Feinerman, "The Evolving Chinese Enterprise," 15 *Syr. J. Int'l L. & Com.* 203, 204 (1988).

82. Gu Report at 2.

83. Const., Art. 7 ("*The State-owned economy, i.e. the sector of the socialist economy under the ownership of the whole people,* is the leading force in the national economy. The State ensures the consolidation and growth of the State-owned economy.") (emphasis added); Clarke Report at p. 6.

84. Const., Art. 8.

85. Const., Art. 11.

86. Const., Art. 6; Gu Report at 2; Wang at 95.

87. *See* Clarke Report at 5–6.

88. *See* Wang at 95–96.

89. Civil Law, Art. 2.

90. Wang at 96.

91. *See* Const., Arts. 6–8 & 11.

92. Rui Report at 5; Gu Report at 3.

93. Industrial Enterprises Law, Art. 1 states "This Law is formulated in accordance with the Constitution of the People's Republic of China, in order to ensure the stability and development of economic ownership by the whole people, to clarify the rights and liabilities of industrial enterprises owned by the whole people, to safeguard the enterprises' legal rights and interests, to increase their vitality and to accelerate China's socialist modernization."

manage. Industrial Enterprises Law, Art. 2.

Article 2 of the 1994 Regulations Governing Supervision and Management of State–Owned Enterprises' Property [94] states that the goal of allowing industrial enterprises greater management autonomy is to increase the value of state-owned enterprise assets operated and managed by the enterprises:

By changing government functions, straightening out the relationship between ownership and management of enterprises, transforming the operating mechanisms of enterprises, ensuring state ownership of enterprises' property and giving enterprises the right to manage their own affairs, the state shall strive to turn enterprises into legal entities responsible for their own decisions on their operation and expansion; for their own profits and losses and for their self-development and self-restraint; and into major competitive bodies in the market, *so as to preserve and increase the value of state assets.*

1994 Regs., Art. 2 (emphasis added).

The Industrial Enterprises Law's implementing regulations make clear that industrial enterprises "owned by the whole people," such as CNMC, are "state-owned." The 1992 Regulations provide that "[a]ssets of enterprises belong to the people, that is, to the state." 1992 Regs., Art. 41. The 1994 Regulations similarly provide that "[e]nterprises' property is owned by all the people, that is, owned by the state." 1994 Regs., Art. 5.[95] Although Professor Rui states that his category of "social property" is still often referred to as "state-owned" property as a result of the "historical context," the implementing regulations make clear that the term "state-owned" is not merely an historical remnant or an otherwise meaningless slogan. Article 41 of the 1992 Regulations and Article 5 of the 1994 Regulations both provide that the State Council exercises the right of ownership of enterprises' assets on behalf of the state. 1992 Regs., Art. 41 ("The State Council shall exercise the proprietary rights over these assets on behalf of the state."); 1994 Regs., Art. 5 ("The State Council exercises the right of ownership of enterprises' property on behalf of the state."). It is clear from this statutory and regulatory scheme that the state owns industrial enterprises such as CNMC, and that the State Council, an identifiable government entity, exercises the right of ownership on behalf of the state.[96]

94. The Industrial Enterprises Law authorizes the State Council to enact regulations to implement its provisions and requires industrial enterprises to abide by the regulations. Industrial Enterprises Law, Arts. 5 & 67. The Chinese State Council has formulated two sets of regulations that control the behavior of the state-owned industrial enterprises and the relevant government agencies charged with their oversight. In 1992 the State Council promulgated the Regulations on Transforming the Management Mechanisms of State–Owned Industrial Enterprises (the "1992 Regulations"), *translated in* FBIS National Affairs, FBIS–CHI–92–145, and in 1994 it promulgated the Regulations Governing Supervision and Management of State–Owned Enterprises' Property (the "1994 Regulations"), Exhibit B–4 to Vol. I to Exhibit 1 to Clarke Deposition.

95. *See* Clarke Report at 6; Hong Hu, "Deepen Enterprise Reform and Expand the State-owned Economy," *Renmin Ribao*, 21 Nov. 1995 at p. 9, *translated in* 1995 BBC Summary of World Broadcasts, 20 Dec. 1995 at pp. 35–36, Exhibit F–16 to Exhibit Vol. II to Clarke Deposition ("Having clear-cut property rights is the primary condition for the modern enterprise system. We must make it clear that the state-owned assets of enterprises belong to the state and must clearly identify the contributors of state-owned assets of enterprises and their rights and responsibilities. At the same time, we must also establish the independent legal status of enterprises. At present, it is quite clear that the state-owned assets of state enterprises belong to the state.").

96. *See* Clarke Report at p. 6; Robert Art and Minkang Gu, "China Incorporated: The First Corporation Law of the People's Republic of China," 20 *Yale J. of Int'l L.* 273, at Westlaw copy p. 3 (1995) (the "dominant feature of economic organization in the People's Republic of China has been enterprise owned by the state as representative of 'the whole people'"); Harry Zheng, "Business Organization and Securities Law of the People's Republic of China, 43 *Bus. Law.* 551, 563 (1988) ("The government, as the legitimate representative of the State and the Chinese people, exercises the ownership of state-owned enterprises."); The Modern Enterprise System Investigation and Study Group, "Establish a Modern Enterprise System That is in Keeping with the Socialist Market Economic Structure," *Renmin Ribao*, 21 Dec. 1993, at pp. 5ff, *translated in* FBIS Daily Report, FBIS–CHI–94–012 ("The state-owned assets of enterprises are owned by the whole people, that is, by the state. The State Council exercises the right of ownership of the assets on behalf of the state. To state-

The scope of industrial enterprise assets owned by the state is broad. The "assets" of an industrial enterprise include "the various types of assets the state has invested in enterprises, assets which have been gained through such investments, and other assets considered owned by the people or put under the management and administration of enterprises by law or according to the administrative statutes regarding the control of state-owned assets." 1992 Regs., Art. 41.[97] Enterprise assets owned by the state thus include assets invested in the enterprise by the state in various forms and the return on those assets (i.e., the enterprise's profits).[98] CNMC was founded with funds invested by the state. TCL alleges, and CNMC does not dispute, that no non-state entity has made any equity investment in CNMC since its inception.

That the Chinese government allows an enterprise to retain some of its return on state-owned assets does not negate the government's right to receive them. Article 42 of the 1992 Regulations gives the state the right to decide how enterprise profits will be allocated between the state and the enterprise and how the enterprise and its assets will ultimately be managed:

To guarantee the proprietary rights of enterprise assets, *the government and relevant departments shall separately perform the following duties:*

(1) examine indicators showing stability and increment in the values of enterprise assets and conduct examinations over and supervise the auditing of debts, profits, and losses incurred on the assets of enterprises;

(2) *decide on how to divide profits reaped using the assets and on the proportions or amount to be shared between the state and enterprises according to relevant State Council stipulations;*

(3) make decisions regarding and approve production-related construction projects for enterprises according to relevant stipulations by the State Council—not including investment projects carried out based on the decision of the enterprises themselves, as stipulated in Article 13 of these regulations;

(4) *decide on or approve the method of management for enterprise assets and the establishment, merging (not including acquisition), division, shutdown, and auctioning of enterprises, as well as the approval of applications made by enterprises to conduct acquisitions and to declare bankruptcy;*

(5) examine and approve, according to relevant stipulations by the State Council, reports concerning damages on and the using up and forfeiting of enterprise assets as well as the mortgages and compensated transfer of key equipment, whole sets of equipment, and

owned enterprises the essence of the legal entity system is to confirm that the state possesses ownership of the property and that enterprises possess independent legal property rights and accordingly enjoy rights and shoulder responsibilities under civil law.... For state-owned enterprises, confirming the legal property rights will not change the state's status as the owner and the only change is the mode by which the state manages state-owned assets.... What is important is that both the value increases of and returns on the state-owned assets of enterprises belong to the state.").

Although Professor Rui cites the new Chinese bankruptcy law as proof of reduced government ownership and control over enterprises owned by the whole people, Chapter I of the Law on Enterprise Bankruptcy makes clear that this "Law is applicable to *State enterprises*" and has been "formulated [among other things] to suit the needs of socialism's planned development of

the commodity economy and reform of the economic system [and] to promote enterprises *owned and operated by the State.*" Bankr.Law, Arts. 1 & 2 (emphasis added).

97. *See also* 1994 Regs., Art. 3 ("Enterprises' property, or the state-owned assets of enterprises, refers to property created through various forms of state investments in enterprises and through investment returns, as well as enterprises' other state property recognized by laws and administrative regulations.").

98. Clarke Report at p. 6; The Modern Enterprise System Investigation and Study Group, "Establish a Modern Enterprise System That is in Keeping with the Socialist Market Economic Structure," *Renmin Ribao*, 21 Dec. 1993, at p. 5ff, *translated in* FBIS Daily Report, FBIS–CHI–94–012 ("What is important is that both the value increases of and returns on the state-owned assets of enterprises belong to the state.").

important buildings; and handle the liquidation, receiving, and handing over of assets of enterprises which have been annulled or disbanded;

(6) decide on or approve, according to terms and procedures provided for in the law, appointment and removal (employment and dismissal), awarding, and punishment of directors of enterprises;

(7) *draw up laws and regulations to manage enterprise assets and conduct supervision and examination on the enforcement of such laws and regulations;*

(8) protect the exercising, by enterprises, of their business rights, according to law; guarantee enterprises nonintervention in their production and operating activities; and help enterprises overcome practical issues.

1992 Regs., Art. 42 (emphasis added).[99]

The 1994 Regulations also delegate to the state entities "in charge of the management of state-owned assets" the duty of "supervising the preservation and appreciation" of the value of state-owned property managed by industrial enterprises. *See, e.g.,* 1994 Regs., Arts. 10–17.[100] State Council "administrative departments" are charged with drawing up laws and regulations for the management of enterprise property, establishing a reporting system for enterprise property, exercising supervision over the preservation and appreciation of the value of state-owned assets, and solving disputes over property rights of state-owned assets. 1994 Regs., Art. 10. Other "relevant government departments" under the State Council supervise the preservation and appreciation of the value of enterprise property, decide, or make suggestions for, the appointment and dismissal of plant managers, and propose and dispatch boards of supervisors to enterprises. 1994 Regs., Art. 13. The government board of supervisors is charged with on-site supervision of the enterprise's preservation and appreciation of the value of state-owned property. 1994 Regs., Art. 17. The regulations require industrial enterprises to set up internal procedures to ensure the preservation and appreciation of the value of state-owned property and net assets. 1994 Reg., Arts. 32–34.[101]

**99.** *See also* Clarke Report at 7–8 ("[I]t is incorrect to claim that enterprise profits ultimately belong in some sense to the enterprise itself. Like profits in a wholly owned company, they are held formally in the name of the company in its bank account but can at any time, at the direction of the sole shareholder, be distributed to him or it as a dividend because they represent a return on capital. That the Chinese government chooses to let some profits remain in the corporation in no way negates its claim to receive them at will.... Article 42 of [1992] Regulations makes it clear ... that it is governmental departments in charge of the enterprise that have the right to decide how enterprise profits shall be allocated between the government and the enterprise ...").

**100.** *See also* Clarke Report at pp. 13–20.

**101.** Under Article 42 of the 1992 Regulations if CNMC were sold, merged, or liquidated, the government department in charge, not CNMC's employees or society as a whole, would take the assets. 1992 Regs., Art. 42(5). *See* Clarke Report at 13–14. Individual workers of state-owned industrial enterprises do not own stock in the enterprises. *See* Andrei Baev, "Civil Law and the Transformation of the State Property in Post–Socialist Economies: Alternatives to Privatization," 12 *UCLA Pac. Bas. L.J.* 131, 167 (1993).

The government has refused to separate the property ties between the state and state-owned industrial enterprises, in part because China does not maintain an independent social welfare system for the unemployed, sick, and uninsured. *See* Wang at 132. Industrial enterprises thus "function more as welfare societies than as production sets." *Id.* at 131. Workers in state-owned industrial enterprises claim many work benefits, including schooling, child care, housing, pensions, and other forms of welfare as part of an "iron rice bowl" of lifetime employment and social benefits. *See* Art and Gu at Westlaw copy p. 3. For state-owned enterprises profitability is often not the central goal or even a likely outcome. *Id.*

Zhang Baolong makes a veiled reference to privatization by suggesting that CNMC may sell shares of stock in the future in the public securities market. As Minkang Gu explained in his report, the growth of securities markets in China has not, however, threatened state ownership of industrial enterprises because the new forms of ownership such as bondholding and shareholding have never been intended to reach a level of majority private ownership, and the state or collectives remain in control of every large enterprise in China. Gu Report at 6; Art and Gu at Westlaw copy p. 5, nn. 61–63; Qian at 82, 87, 92, 93–94; Feinerman at 204–05; Ren Kan, "The state of the State's shares," *Bus. Weekly, China*

Under this separation of ownership rights and operation and management rights, state-owned assets are entrusted to industrial enterprises "to operate and manage," not to own. *See, e.g.,* Industrial Enterprises Law, Arts. 2 & 14; 1992 Regs., Art. 3 (transforming enterprises' management mechanism must occur while still "ensuring the state's ownership of enterprises' property and maintaining and increasing the value of enterprises' property"); 1992 Regs., Art. 6 (state property entrusted to enterprises "for management and business purposes"); 1994 Regs., Art. 1 ("These regulations are formulated for the purpose of strengthening supervision and management of the property of state-owned enterprises."); 1994 Regs., Art. 8 ("Enterprises shall independently manage, according to law, the property entrusted for their operation and management by the state."); 1994 Regs., Art. 9 (principles to be followed by government entities and state-owned enterprises include: "separating ownership of enterprise property from the right to manage it; separating government administration and enterprise management; and preserving capital and safeguarding the rights and interests of owners"). The state retains ownership of enterprise assets, and there is no suggestion in the Industrial Enterprises Law or its implementing regulations that the state is giving up its ownership rights in the enterprise property.[102]

Unlike ownership rights, enterprise operating and management rights do not include the right to benefit.[103] In most nations the rights of possession, use, and disposition imply the right to the benefits or profits resulting from such use and disposition. *See* Wang at 105–06. This is not the case in China.

> [T]he fact that the right of benefit is specifically excluded from the operating rights of Chinese state enterprises has significant implications. By granting state enterprises the rights of possession, use and disposition but not the right of benefit, the state appears to have conveyed to state enterprises the right to endure and control costs on their own (labor, risk-taking, planning and transaction costs) but not the right to enjoy their own benefits.

Wang at 106.

To ensure that the benefits from state-owned industrial enterprise assets belong to the state, Chinese law provides that operation and management rights are conditional; they are always subject to state oversight.[104] The state, as the owner and contributor of state-owned assets, can exercise ownership control over assets managed by the industrial enterprise either by promulgating new regulations or simply by issuing directives.[105] Many provisions in the Industrial Enterprises Law empower the state to curtail or override the management rights of state-owned enterprises, e.g.,

*Daily,* May 3, 1993, at p. 3 ("State owned shares account for 51 to 80 percent of the total shares of all listed companies."). Commentators speak of the process of selling shares of stock in the public securities market as "corporatization," a more limited reform than privatization. Corporatization entails restructuring state-owned industrial enterprises, adopting the corporate form, and instituting minority stock ownership and trading without relinquishing the state's controlling interest in the means of production. Art and Gu at Westlaw copy p. 5; Qian at 92; Andrei A. Baev, "Is There a Niche for the State in Corporate Governance? Securitization of State-Owned Enterprises and New Forms of State Ownership," 18 *Hous. J. Int'l L.* 1, 6 (1995); Matthew Bersani, "Privatization and the Creation of Stock Companies in China," 1993 *Columbia Bus. L.Rev.* 301, 303 (1994).

**102.** *See* Gu Report at 7; Wang at 93–94 ("The separation of ownership rights from operating rights in China should be distinguished from the

separation of ownership and control that is prevalent in Western corporations.... Corporate America is based on the premise that a corporation is an independent legal entity that owns the assets under its management. Thus, in the American corporate context, 'ownership by stockholders' is shorthand for the possession of organizational control over the corporation, rather than direct property rights control over corporate assets. In China, where the major means of production are owned by the state, the key issue is: what kind of asset management rights does a state enterprise have over state-owned assets?").

**103.** *Compare* Industrial Enterprises Law, Art. 2 with Civil Law, Art. 71. *See also* Gu Report at 2; Wang at 93–94.

**104.** *See* Wang at 123.

**105.** *See* Art and Gu at Westlaw copy p. 4 & n. 30 ("significant regulatory restrictions circum-

"in accordance with the law" (articles 2, 3 and 6),

"within the scope prescribed by law" (article 13),

"under the guidance of State plans" (article 22),

"unless State Council regulations prescribe otherwise" (article 24), and

"in accordance with State Council regulations" (articles 26–29).[106]

### d. CNMC's documents

The documentary evidence provided by CNMC during discovery shows that CNMC held itself out to potential clients and creditors as a state-owned industrial enterprise as late as November of 1995. For example, CNMC's listing in the Special Issue on China Chamber of Commerce For Import and Export of Machinery and Electronics states that CNMC "is a large state-owned trading company under the Ministry of Foreign Trade and Economic Cooperation."[107] A 1995 CNMC brochure lists CNMC as "a large state-owned foreign trade company dealing mainly in the import and export of machinery and electrical products" and again later as "a large state-owned trade company under the Ministry of Foreign Trade and Economic Cooperation."[108]

CNMC also claimed to be a state-owned industrial enterprise during the arbitration process in this case. In her deposition taken on April 4, 1995, Madam Wang Weili, a CNMC representative and the principal contract negotiator with TCL on behalf of CNMC,[109] testified that CNMC remains "one of the biggest state-owned trading companies" in China.[110] Three months after the arbitration award was entered CNMC again warranted that it was a state-owned industrial enterprise in order to receive a short-term loan from a major Hong Kong bank. On November 30, 1995, The Sanwa Bank Limited of Hong Kong sent CNMC a "Short Term Loan Facility" to make available to CNMC an "uncommitted short term multi-currency revolving loan facility" upon and subject to certain terms set out in the loan agreement.[111] CNMC's general manager accepted the terms and conditions on behalf of CNMC on December 4, 1995.[112] In accepting the terms and conditions CNMC "represented and warranted," among other things, that it was "a state-owned enterprise duly incorporated and validly existing under the laws of the People's Republic of China."[113]

106. *See also* Wang at 115 ("[A]s the owner of state-owned assets, the state can reallocate the assets to another enterprise without compensation. This reallocation is considered an administrative decision, and therefore, not subject to the rules of the Civil Law."); Deborah K. Johns, "Reforming the State–Enterprise Property Relationship in the People's Republic of China: The Corporatization of State–Owned Enterprises," 16 *Mich. J. Int'l L.* 911, at 8 (1995) ("Th[e Enterprises Law] defines the rights of the [state-owned enterprise] to use the state-owned assets by instituting the idea of enterprise operating rights.' Although the State Industrial Enterprises Law clearly indicates that ownership and operating rights are separate, it defines operating rights in such a way that they seem virtually indistinguishable from ownership rights. Even a cursory reading of the law, however, shows what the distinction between the two types of rights must be: The phrase 'in accordance with State Council Regulations' is ubiquitous in articles delineating enterprise operating rights, suggesting that the state has the ability to trump the [state-owned enterprises'] operating rights virtually at will"); Art & Gu at Westlaw copy p. 4 & n. 30.

107. Special Issue on China Chamber of Commerce For Import and Export of Machinery and Electronics at p. 11, Exhibit C to TCL's Supplemental Brief on Jurisdictional Issues. The issue dates from no earlier than 1995. *See id.* at p. 13 (referring to December 1994 in the past tense).

108. 1995 CNMC brochure at CNMC batch numbered pages 003611 & 003612, Exhibit C–2 to Vol. II of Exhibit 1 to Clarke Deposition.

109. Transcript of arbitration hearing at vol. II, p. 47.

110. Videotaped Deposition of Madam Wang Weili at p. 166, Exhibit C–6 to Vol. II of Exhibit 1 to Clarke Deposition.

111. November 30, 1995, letter from The Sanwa Bank Limited of Hong Kong to CNMC, at p. 1, Exhibit C–1 to Vol. II of Exhibit 1 to Clarke Deposition.

112. November 30, 1995, letter from The Sanwa Bank Limited of Hong Kong to CNMC, at p. 13.

113. November 30, 1995, letter from The Sanwa Bank Limited of Hong Kong to CNMC, at p. 5.

### e. Conclusion

Based on the court's analysis of Chinese law and CNMC's documents the court concludes that Chinese industrial enterprises "owned by the whole people," including CNMC, are "state-owned," with proprietary rights exercised by the State Council on behalf of the state. Because CNMC is state-owned the court also concludes that CNMC is an agency or instrumentality of the People's Republic of China within the meaning of 28 U.S.C. § 1603(b)(2) (an "entity a majority of whose shares *or other ownership interest* is owned by a foreign state or political subdivision thereof" is an agency or instrumentality of a foreign state) (emphasis added). Professor Rui's opinion that the 1988 Industrial Enterprises Law somehow converted "ownership by the whole people" from "state ownership" into a form of "social ownership" is not supported by Chinese law. The Constitution, the Civil Law, and the Industrial Enterprises Law and its implementing regulations do not refer to a separate category of "social property" or "social ownership," and do not distinguish between "government property" and "social property."[114]

### f. *Edlow*

CNMC argues that adherence to the strict majority ownership test of 28 U.S.C. § 1603(b)(2) would render virtually every enterprise in China an agency or instrumentality of the Chinese government under the FSIA. To avoid this result CNMC argues that the court should apply the *Edlow* analysis to determine whether CNMC is an organ of the Chinese government or whether the Chinese government actually exercised control over its operations.[115] In this case, however, the court is not faced with the dilemmas faced by the court in *Edlow*. Private enterprises clearly exist in China, and the Chinese government is encouraging their growth.[116] A Chinese private enterprise would not be an agency or instrumentality of the Chinese state under the FSIA. Moreover, the evidence of state ownership of CNMC in this case goes well beyond the naked presumption based on socialist political ideology offered by the plaintiff in *Edlow*. Because Chinese law makes it clear that CNMC remained a state-owned industrial enterprise even after its 1992 reorganization, the court concludes that an analysis under *Edlow* is unnecessary, even if such an analysis were relevant.[117] CNMC is an agency or instru-

---

114. *See also* Clarke Report at 9–12; Gu Report at 2. *See generally* Andrei Baev, "Civil Law and the Transformation of the State Property in Post–Socialist Economies: Alternatives to Privatization," 12 *UCLA Pac. Bas. L.J.* 131, 133, 165–67 (1993).

115. At the January 26, 1996, hearing, the court noted that the *Edlow* analysis might be helpful in determining whether CNMC is an organ of China, and in determining whether the nation of China may have exercised control over CNMC. (Transcript of January 26, 1996, hearing at p. 12) Because the court was concerned that CNMC had briefed the issue of *Edlow's* applicability in its prior filings and that TCL had failed to respond, the court ordered TCL "to address that issue" in its supplemental briefing. (Transcript of January 26, 1996, hearing at p. 12) The court did not conclude that it would reach the *Edlow* analysis; it merely wanted complete briefing by both sides on all potential issues, including *Edlow*.

116. In 1981 China began allowing private enterprises to operate. Michael Nikkel, Note, " 'Chinese Characteristics,' in Corporate Clothing: Questions of Fiduciary Duty in China's Company Law," 80 *Minn. L.Rev.* 503, 508–09 (1995); Alison Conner, "To Get Rich is Precarious: Regulation of Private Enterprise in the People's Repub-

lic of China," 5 *J. Chinese L.* 1 (1991). The Chinese Constitution was amended in 1982 to recognize the "rights" of "individual businesses" and "private enterprise" and again in 1988 to grant legal protections to the "individual economy." Const., Art. 11. *See also* Nikkel at 508–09; Art & Gu at Westlaw copy pp. 4–5. The private enterprise system is to be a "complement to the socialist public economy," and the socialist public economy, which includes state-owned enterprises and collectives, remains the "leading force in the national economy." Const., Art. 6, 7 & 11. "Individual enterprises" obtained their legal status with passage of the Civil Law in 1986. Civil Law, Art. 28. In 1988 the State Council enhanced the private enterprise system with the promulgation of the Provisional Regulations of the People's Republic of China Concerning Private Enterprises. *See* 1988 Regs., Art. 1 (The regulations were "formulated to encourage and guide the healthy development of private enterprises, [and] to safeguard their legal rights and interests."), *translated in* E. Asian Executive Rep., Oct. 15, 1988, at 26, available in LEXIS, NEXIS Library, EASIAN File.

117. The court previously held in *Delgado v. Shell Oil Co.*, 890 F.Supp. at 1319, the additional analysis performed in *Edlow* is not supported by the text of the FSIA.

mentality of the People's Republic of China because it is owned by the Chinese state.

### 2. Does the court have jurisdiction over CNMC under an exception to immunity?

The court's conclusion that CNMC is an agency or instrumentality of China does not end the court's inquiry under the FSIA. As a foreign state CNMC is entitled to sovereign immunity from suit in the United States unless the relationship or transaction at issue falls within one of the FSIA's exceptions to immunity enumerated in 28 U.S.C. § 1605(a) Section 1605(a) provides in relevant part:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement international agreement in force for the United

States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

If one of these exceptions to sovereign immunity applies the court has subject matter jurisdiction. *See Delgado,* 890 F.Supp. at 1319.

■ TCL alleges that the court has jurisdiction under § 1605(a)(6)(A) over its claim to confirm the arbitral award pursuant to the FAA.[118] CNMC does not challenge this allegation, and the court agrees that it has jurisdiction over the FAA claim under this subsection.

■ Section 1605 (a)(6) also supplies jurisdiction over TCL's claim under the New York Convention. Section 1605(a)(6)(B) allows the court to exercise jurisdiction over CNMC if the arbitration award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." The Convention falls squarely within the terms of this exception. *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993) (concluding that "the Convention is exactly the sort of treaty Congress intended to include in the arbitration exception" of the FSIA); *Matter of Arbitration Between Chromalloy Aeroservices v. Arab Republic of Egypt,* 939 F.Supp. 907, 909 (D.D.C.1996). TCL's claim under the Convention is thus excepted from the immunity provided to CNMC under § 1604.[119]

---

Nothing in § 1603(b) or any other provision of the FSIA suggests that a corporation able to satisfy the majority ownership requirement of § 1603(b)(2) must also meet the separate test performed by the *Edlow* court. Because the FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States," this court joins those courts that have declined to judicially engraft the *Edlow* test onto the § 1603(b)(2) "ownership" inquiry.

**118.** Amended Petition to Confirm Arbitration Award at p. 2, ¶ 3 and n. 2.

**119.** The court also has jurisdiction under the waiver exception to sovereign immunity, 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the foreign state has waived its immunity either explicitly or by implication."). The legislative history of the FSIA suggests that implicit waivers are ordinarily found in three situations: (1) the foreign state agrees to arbitration in another country, (2) the foreign state agrees that the contract is governed by laws of a particular country, and (3) the foreign state files a responsive pleading without raising the immunity defense. H.Rep. No. 1487, 94th Cong.2d Sess. 18,

## C. Jurisdiction Under the New York Convention

CNMC argues that TCL's claim under the Convention must nonetheless be dismissed for lack of subject matter jurisdiction because the Convention does not apply to arbitration awards rendered in the United States. Resolution of CNMC's argument requires the court to decide whether the Convention can apply to arbitration awards rendered in the United States and, if so, whether the Convention applies to TCL's award against CNMC. To appreciate the parties' arguments it is necessary to understand the purpose of the "nondomestic" exclusion to Article I(1).

### 1. Can *the Convention apply to arbitration awards rendered in the United States?*

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (1970), *reprinted in* 9 U.S.C. § 201, was adopted by the United States in 1970. *See Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 929 (2d Cir.1983).

Article I(1) of the Convention states:

This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

CNMC argues for a narrow reading of the Convention. It argues that the Convention as adopted by the United States was not intended to cover awards rendered in the United States and that because the arbitration award in this case was rendered in Houston, Texas, the Convention does not apply. TCL responds that its arbitration award is "not considered as domestic" within the meaning of Article I(1) of the Convention and that the court has jurisdiction under 9 U.S.C. §§ 202–208, the United States' implementing legislation.

Article I(3) of the Convention authorizes a State when acceding to the Convention "on the basis of reciprocity [to] declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." [120] In its 1970 declaration of accession to the Convention the United States adopted the reservation authorized by Article I(3) and announced that "[t]he United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." [121] CNMC argues that this reciprocity reservation not only excludes awards made in nonsignatory States, but, in order to give meaning to the word "another," also excludes awards made in the United States.

The court is not persuaded by CNMC's interpretation of Article I(1). After considering persuasive precedent from other circuits, the statutory framework adopted by Congress to implement the Convention in the United States, and the history of the United States' subsequent 1990 adoption of the anal-

---

reprinted in 1976 U.S.Code Cong. & Admin. News 6604, 6617. *See also Rodriguez v. Transnave, Inc.,* 8 F.3d 284, 287 (5th Cir.1993). Although these waiver provisions are narrowly construed, *Zernicek v. Petroleos Mexicanos (Pemex),* 614 F.Supp. 407, 411 (S.D.Tex.1985), *aff'd,* 826 F.2d 415 (5th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988), courts have found an implicit waiver of sovereign immunity when the foreign state contracts to arbitrate in the United States. *See Maritime Ventures Int'l v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1351 (S.D.N.Y.1988); *Ohntrup v. Firearms Center, Inc.,* 516 F.Supp. 1281, 1284–85 (E.D.Pa.1981) (dicta), *aff'd,* 760 F.2d 259 (3d Cir.1985); *Verlinden B.V. v. Central Bank*

of Nigeria, 488 F.Supp. 1284, 1302 (S.D.N.Y. 1980) (dicta), *aff'd,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Because the contracts in this case, which name Houston as the forum for arbitration, fit within the narrowest reading of the Act, CNMC's contracts with TCL waive immunity for purposes of subject matter jurisdiction.

120. A brief history of the New York Convention is provided in *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 930–32 (2d Cir.1983).

121. Note 58 following 9 U.S.C. § 201.

ogous Inter–American Convention on International Commercial Arbitration of 1975, the court concludes that the "nondomestic" clause of Article I(1) may apply to arbitration awards rendered in the United States.

No court has accepted CNMC's interpretation of the reciprocity reservation, and it has been rejected by the Second and Seventh Circuits. *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 932 (2d Cir.1983); *Lander Co. v. MMP Investments,* 107 F.3d 476, 481–82 (7th Cir.1997), *pet. for cert. filed,* 65 U.S.L.W. 3799 (May 19, 1997) (No. 96–2684). In *Bergesen* the Second Circuit rejected the narrow interpretation of the Convention urged by CNMC and held that neither the history nor the language of the Convention precluded its applicability to arbitration awards rendered in the United States. Relying on the Supreme Court's construction of the Convention in *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974) ("The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts."), the court concluded that the treaty language should be interpreted broadly to effectuate its recognition and enforcement purposes. 710 F.2d at 932. In *Lander* the Seventh Circuit also rejected the interpretation proposed by CNMC.

[A]s natural a way to read the declaration is that the United States will enforce pursuant to the Convention only arbitral awards made in nations that also adhere to the Convention. This is the significance of the reference to reciprocity. The United States will not enforce an arbitration award made in a country that, by failing to adopt the Convention, has not committed itself to enforce arbitration awards made in the United States. Granted, "a Contracting State" would be clearer, but "another Contracting State" is clear enough in context; it means "another signatory of the Convention, like the United States, as opposed to nonsignatories."

107 F.3d at 481–82.

The implementing statutes, 9 U.S.C. §§ 202–208, also support the conclusion that the Convention may apply to awards rendered in the United States. Section 202 of Title 9 of the United States Code, entitled "Agreement or award falling under the Convention," provides in relevant part:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

Section 202 was intended to ensure that "an agreement or award arising out of a legal relationship exclusively between citizens of the United States is not enforceable under the Convention in [United States] courts unless it has a reasonable relation with a foreign state." H.R.Rep. No. 91–1181, 91st Cong., 2d Sess. (1970) 2, *reprinted in* 1970 U.S.Code Cong. & Admin. News 3601, 3602 1970 U.S.C.C.A.N. 3601, 3602.

As the *Bergesen* court explained:

Inasmuch as it was apparently left to each state to define which awards were to be considered nondomestic ... Congress spelled out its definition of that concept in section 202. Had Congress desired to exclude arbitral awards involving two foreign parties rendered within the United States from enforcement by our courts it could readily have done so. It did not.

710 F.2d at 933. Section 206 states that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." As the court explained in *Bergesen,* "[i]t would be anoma-

lous to hold that a district court could direct two aliens to arbitration within the United States under the statute, but that it could not enforce the resulting award under legislation which, in large part, was enacted for just that purpose." 710 F.2d at 933.

The United States' 1990 adoption of the analogous Inter–American Convention on International Commercial Arbitration of 1975 (the "Inter–American Convention") also supports the court's conclusion that the reciprocity reservation does not limit the territorial application of the nondomestic clause.[122] In adopting the Inter–American Convention the United States included the same reciprocity reservation it required in adopting the New York Convention: "The United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." 132 Cong. Rec. § 15,767 (daily ed. Oct. 9, 1986), *reprinted in* 9 U.S.C. § 301. To clarify the scope of the United States' reservation in adopting the Inter–American Convention Congress stated in section 304 of the implementing legislation that "[a]rbitral decisions or awards made in the territory of a foreign State shall, on the basis of reciprocity, be recognized and enforced under [the Inter–American Convention] only if that State has ratified or acceded to the Inter–American Convention." 9 U.S.C. § 304. Congress noted that section 304 is "intended only to be a rule of reciprocity. It is *not* a determination that arbitral decisions and awards made in the United States are excluded from the applicability of the Inter–American Convention." 135 Cong. Rec. § 16370-03, § 16392 1989 WL 197240 (C.R. Nov. 20, 1989) (emphasis added). Had Congress disagreed with *Bergesen*'s earlier interpretation of the same

reciprocity reservation to the New York Convention, and intended to exclude from the federal courts' jurisdiction under the Inter–American Convention all awards rendered in the United States, it could easily have expressed such an intention in the implementation legislation.[123]

CNMC argues that these authorities do not adequately consider the legislative history and scholarly commentary surrounding the adoption of the Convention. According to CNMC, the legislative history demonstrates that the United States intended to apply the Convention to awards rendered in foreign signatory nations in the interests of protecting American citizens and businesses. CNMC cites House Report 91–1181, in which the Committee on the Judiciary reported:

> In the committee's view, the provisions of [the Convention] will serve the best interests of Americans doing business abroad by encouraging them to submit their commercial disputes to impartial arbitration for awards which can be enforced in both U.S. and foreign courts.

H.R.Rep. No. 91–1181, 91st Cong., 2d Sess. (1970) 2, *reprinted in* 1970 U.S.Code Cong. & Admin. News 3601, 3602.

The court is not persuaded by this argument. House Report 91–1181 does not refer to the nondomestic exclusion, nor does it preclude an interpretation that awards rendered in the United States may be subject to the Convention. Although it is true that an important goal of the Convention from the perspective of the United States was to protect the interests of Americans doing business abroad, that goal is not undermined by the enforceability in United States' courts of arbitration awards rendered in the United

---

**122.** *See* H.R.Rep. No. 501, 101st Cong., 2d Sess. 5 (1990), *reprinted in* 1990 U.S.Code Cong. & Admin. News 675, 678 1990 U.S.C.C.A.N. 675, 678. ("The New York Convention and Inter–American Convention are intended to achieve the same results, and their key provisions adopt the same standards.... It is the Committee's expectation ... that courts in the United States would achieve a general uniformity of results under the two conventions.").

**123.** *See also* H.R.Rep. No. 501, 101st Cong., 2d Sess. 5 (1990), *reprinted in* 1990 U.S.Code Cong. & Admin. News 675, 678 (noting that the Inter–

American Convention applies "the same rule followed under the earlier New York Convention, that foreign arbitration awards, on the basis of reciprocity, will only be recognized from countries that have also ratified the Convention"); *Productos Mercantiles E Industriales, S.A. v. Faberge USA*, 23 F.3d 41, 44 (2d Cir.1994) (concluding that the reservation and 9 U.S.C. § 304 of the implementing statute did not exclude arbitral awards rendered in the United States from the court's jurisdiction under the Inter–American Convention).

States. The secondary authority cited by CNMC.[124] does not persuade the court in the face of the authorities discussed above.

### 2. *Does the Convention apply to the award rendered against CNMC?*

█ CNMC argues that even if the Convention may apply to arbitration awards rendered in the United States, it does not apply in this case because the arbitration with TCL was "domestic," having taken place in Houston, using American arbitrators appointed by the AAA, and following the AAA's domestic arbitral rules.

The leading case interpreting the scope of the "domestic" clause in Article I(1) of the Convention is the Second Circuit's decision in *Bergesen.* Sigval Bergesen, a Norwegian shipowner, and Joseph Muller Corporation, a Swiss company, entered into three charter parties for the transportation of chemicals. Each charter party contained an arbitration clause providing for arbitration in New York. In 1972, after disputes had arisen during the course of performing the charters, Bergesen demanded arbitration. An arbitration panel held a hearing applying the AAA domestic rules and rendered a decision in favor of Bergesen. Bergesen filed a petition in the United States District Court for the Southern District of New York to confirm the arbitral award, and the court confirmed the award, holding that the Convention applied to arbitration awards rendered in the United States involving foreign parties.

On appeal Muller argued that the Convention did not cover enforcement of the arbitration award made in the United States because it was a "domestic" award within the meaning of the Convention. The Second Circuit rejected Muller's argument:

The Convention did not define nondomestic awards. The definition appears to have been left out deliberately in order to cover as wide a variety of eligible awards as possible, while permitting the enforcing authority to supply its own definition of

"nondomestic" in conformity with its own national law.... We adopt the view that awards "not considered as domestic" denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or *involving parties domiciled or having their principal place of business outside the enforcing jurisdiction.* ... We prefer this broader construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards, *see Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974). Applying that purpose to this case involving two foreign entities leads to the conclusion that this award is not domestic.

710 F.2d at 932 (emphasis added).

CNMC argues that the history of the Convention makes it apparent that the "nondomestic" exception is limited to arbitration awards rendered under foreign arbitration law and that *Bergesen* was wrong when it expanded the definition of "nondomestic" to include awards "involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." CNMC notes that the nations that negotiated the Convention fell into two primary groups: the Common Law group and the Civil Law group. *See* Paolo Contini, "International Commercial Arbitration: The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 8 *Am. J. Comp. L.* 283, 292 (1959) ("Contini"). The first draft of the Convention incorporated a territorial concept of enforcement and recognition by providing that the Convention only applied to awards made in a country other than that where enforcement was sought. *Id.* Members of the Civil Law group objected to the territorial concept because it was not expansive enough in defining what was considered a "foreign" award in their countries.

---

124. *See* A.J. van den Berg, *The New York Arbitration Convention of 1958,* at 11 (1981); G. Aksen, "American Arbitration Ass'n Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and En-forcement of Foreign Arbitral Awards," in *New Strategies for Peaceful Resolution of International Business Disputes,* at 42–43 (Hardcover ed., 1971).

*Id.* For example, in France and Germany the nationality of an arbitral award depended on the law governing the arbitration procedure. *Id.* The Civil Law group proposed that the Convention should apply to the recognition and enforcement of arbitration awards "other than those considered as domestic in the country where enforcement was sought." *Id.* at 292–93. Ultimately, both the territorial concept and the nondomestic concept were included in Article I(1) of the Convention. *Id.* at 293. Relying on the law of France and Germany as a statement of the Civil Law position, CNMC argues that the nondomestic clause was only intended to apply to awards which, although rendered in the country in which they are sought to be enforced, were rendered under foreign arbitral rules. Because the arbitration between TCL and CNMC was conducted under the domestic rules of the AAA, CNMC argues that the award is "domestic" and that the court lacks jurisdiction.

In support of its position CNMC argues that a subsequent decision interpreting *Bergesen* states that "*the nationality* (that is, is the award foreign and therefore within the Convention, or domestic and therefore outside the Convention) *of award should be determined 'by the law governing the procedure.'*"[125] CNMC's quotation of *Bridas* is misleading. The omitted words that preceded the quoted language stated: "France and Germany, the Court pointed out, had on the other hand, urged that...." Read in context it is obvious that the *Bridas* court was merely reciting France's and Germany's conception of "nondomestic" awards and that the court was not rejecting *Bergesen*'s interpretation of nondomestic, which included arbitral awards involving foreign parties. *Id.*[126] CNMC also cites several commentators who have criticized *Bergesen* for creating an overly broad interpretation of "nondomestic."[127] TCL responds with an equal amount of persuasive secondary authority supporting *Bergesen.*[128]

---

**125.** CNMC's Supplemental Brief on Jurisdictional Issues, at p. 23 (Docket Entry No. 69 in 95–4114), *citing International Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial Y Comercial,* 745 F.Supp. 172, 176–77 (S.D.N.Y. 1990) (emphasis not in original) (quoting *Bergesen*).

**126.** Noting that the only two courts outside the Second Circuit that have cited *Bergesen* for any purpose have refrained from adopting *Bergesen*'s interpretation of "nondomestic" under the Convention, CNMC argues that the courts in the Second Circuit stand alone in their overly broad interpretation of the Convention. *See Tesoro Petroleum Corp. v. Asamera (South Sumatra) Ltd.,* 798 F.Supp. 400, 404 n. 5 (W.D.Tex.1992); *Northrop Corp. v. Triad Fin. Establishment,* 593 F.Supp. 928, 934 n. 9 (C.D.Cal.1984), *rev'd in part on other grounds,* 811 F.2d 1265 (9th Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987). In neither case, however, did the court need to reach the "nondomestic" issue to decide the applicability of the Convention. *See Asamera,* 798 F.Supp. at 404 n. 5 ("Because the Court decides the applicability of the Convention on other grounds, it will not address this issue."); *Northrop,* 593 F.Supp. at 934 n. 9 (noting that based on the "nondomestic" definition in *Bergesen* it was possible that the arbitration was governed both by the Federal Arbitration Act and by the Convention). Neither opinion expressed an unfavorable view of *Bergesen.* Moreover, the Seventh Circuit in *Lander* has cited *Bergesen* as persuasive authority and followed a similar rationale in concluding that the Convention may apply to suits in the United States to enforce arbitral awards made here. 107 F.3d at 482.

**127.** *See, e.g.,* A.J. van den Berg, "When Is An Arbitral Award Nondomestic Under the New York Convention of 1958?," 6 *Pace L.Rev.* 25, 50 (1985) (criticizing *Bergesen*'s concept of the nondomestic exception as overbroad and not supported in law, but admitting that the decision "has been received favorably by commentators in the United States"); M. Strub, Note, "Resisting Enforcement of Foreign Arbitral Awards Under Article V(1)(e) and Article VI of the New York Convention: A Proposal for Effective Guidelines," 68 *Tex. L.Rev.* 1031, 1040 (1990) (following, without elaboration, van den Berg's argument that the nondomestic exception does not apply to the country in which the award was given or under whose law the award was made); F. de Ly, "Symposium: Current Issues In International Commercial Arbitration: The Place of Arbitration in the Conflict of Laws of International Commercial Arbitration: An Exercise in Arbitration Planning," 12 *J. Int'l L. Bus.* 48, 77 (1991) (criticizing *Bergesen* as a case inspired by reasons of United States law only).

**128.** *See, e.g.,* H. Smit, "Eason–Weinmann Center for Comparative Law Colloquium: The Internationalization of Law and Legal Practice," 63 *Tul. L.Rev.* 629, 643–44 (1989) (referring to *Bergesen* as "an enlightened example," "applauded by most," which "properly recognizes the need to provide the broadest possible recognition to arbitral awards"); Note, "Enforcement of Foreign Arbitral Awards—The United Nations Convention

CNMC's recitation of the history of the Convention is also somewhat misleading. Although it is true that the civil law of France and Germany defined foreign arbitrations in terms of the arbitral rules employed, in negotiating the Convention's final language the Civil Law group urged that a number of factors should be considered when determining the nationality of the award, including, among others, "[t]he nationality of parties, the object of the dispute, and the rules of arbitral procedure." Contini, at 292. There was no single, uniform definition of "domestic" suggested by the Civil Law group, nor did the final version of Article I(1) include such a definition. Rather, it is clear from the language of Article I(1) and the ratification history that the definition of "domestic" was intentionally left ambiguous.[129]

*Bergesen* supplied a definition of nondomestic awards that encourages the recognition and enforcement of international arbitral awards. See 710 F.2d at 932.[130] The court adopts the *Bergesen* definition of "non-

domestic" as encompassing actions to confirm arbitration awards rendered in the United States between two foreign parties. Because the court concludes that the Convention applies to TCL's motion to confirm its arbitration award, CNMC's motion to dismiss will be denied.[131]

### III. *Service of Process on CNMC*

CNMC next argues that the court should dismiss this action pursuant to Fed.R.Civ.P. 12(b)(5) for insufficient service of process. TCL served its Petition to Confirm the Arbitration Award on CNMC at CNMC's offices in Beijing, China, by registered United States mail, return receipt requested and by facsimile transmission.[132] TCL then mailed its Amended Petition to Confirm to CNMC's counsel, Robert E. Campbell, by certified mail, return receipt requested.[133] CNMC argues that the service of process by mail of the original Petition to Confirm was insufficient under Fed.R.Civ.P. 4(j),[134] under 28 U.S.C. § 1608(b)[135] (the FSIA's provision for

on the Recognition and Enforcement of Foreign Arbitral Awards," 14 *Ga. J. Int'l & Comp. L.* 217, 230–33 (1984) (applauding the *Bergesen* court's broad interpretation of the Convention's scope for increasing the enforcement of foreign arbitral awards, encouraging arbitration as an alternative to litigation, enabling American businessmen to demand enforcement of judgments considered "foreign" in other countries, and providing an equitable result); Feldman, "An Award Made in New York Can Be a Foreign Arbitral Award," 39 *Arb. J.* 14 (1984) (same); Love, "Arbitration," 15 *J. Mar. L. & Com.* 134 (1984) (same); Phillips, "Recognition of Foreign Arbitral Awards: The Second Circuit Provides a Hospitable Forum," 10 *Brooklyn J. Int'l L.* 489 (1984) (same).

129. *See* Samuel Pisar, "The United Nations Convention of Foreign Arbitral Awards," 33 *S. Cal. L.Rev.* 14, 18 (1959) ("A patent, if largely deliberate, ambiguity is left by the absence of any definition of 'nondomestic' awards".... "The intention behind this omission is to extend as far as possible the variety of eligible awards while at the same time allowing the enforcing authority to supply the definition in conformity with its own law.").

130. "To hold that subject matter jurisdiction is lacking where the parties involved are all foreign entities would certainly undermine the goal of encouraging the recognition and enforcement of arbitration agreements in international contracts." *Sumitomo Corp. v. Parakopi Compania Maritima, S.A.,* 477 F.Supp. 737, 741 (S.D.N.Y. 1979), *aff'd mem.,* 620 F.2d 286 (2d Cir.1980).

131. Because the court concludes that subject matter jurisdiction is appropriate under the FSIA, the court need not address TCL's arguments for jurisdiction under federal bankruptcy law.

132. Summons in a Civil Case and Return of Service, Exhibit C to CNMC's Motion to Dismiss TCL's Amended Petition to Confirm Arbitration Award, Docket Entry No. 12.

133. TCL's Amended Petition at p. 2.

134. "Service upon a foreign state or a political subdivision, agency, or instrumentality thereof shall be effected pursuant to 28 U.S.C. § 1608." Fed.R.Civ.P. 4(j).

135. Section 1608(b) provides: "Service in the court of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

service of process on an agency or instrumentality of a foreign state), and under 9 U.S.C. § 9 (the FAA's provision for service of process). TCL responds that service was sufficient under 28 U.S.C. § 1608(b)(1) and that service pursuant to 9 U.S.C. § 9 was unnecessary. The court agrees with TCL that service of process was sufficient.

■ Rule 12(b)(5) authorizes the court to dismiss a civil action when service of process is inadequate. *See Ross v. Runyon,* 156 F.R.D. 150, 153–54 (S.D.Tex.1994); *Davis–Wilson v. Hilton Hotels Corp.,* 106 F.R.D. 505, 510 (E.D.La.1985). The burden of proof to establish proper service is on the party on whose behalf service is made. *Winters v. Teledyne Movible Offshore, Inc.,* 776 F.2d 1304, 1305 (5th Cir.1985); *Familia De Boom v. Arosa Mercantil, S.A.,* 629 F.2d 1134, 1139 (5th Cir.1980), *cert. denied,* 451 U.S. 1008, 101 S.Ct. 2345, 68 L.Ed.2d 861 (1981); 5A C. Wright & A. Miller, *Fed. Prac. & Proc.* § 1353, at 283 (1990).

CNMC first argues that service by mail fails to comply with the service of process requirements of the FSIA, 28 U.S.C. § 1608(b)(2), which specifies that service on an agency or instrumentality of a foreign state must be made "in accordance with an applicable international convention on service of judicial documents." CNMC argues that service by registered mail is proper pursuant to § 1608(b)(3) only if service cannot be first accomplished under an applicable international convention as required by § 1608(b)(2) and if the complaint is translated into the official language of the foreign state (China) as required by § 1608(b)(3). Here, TCL made no attempt to effect service under an applicable international convention, made no showing to this court of a failure of those procedures before resorting to service by

registered mail, and did not serve a translated copy of the petition to confirm. Consequently, CNMC argues that service of the original petition was insufficient under the FSIA.

■ The court concludes that CNMC has been properly served pursuant to § 1608(b)(1) of the FSIA, which allows for service in accordance with "any special arrangement for service" between TCL and CNMC. The contracts between TCL and CNMC contain such a "special arrangement for service" in Article 20, which provides for mandatory binding arbitration:

20.1 All disputes arising from the execution of or in connection with the Contract shall be first settled through friendly consultations between both parties. In case no agreement can be reached, the dispute shall be submitted for arbitration.

20.2 The place of arbitration is Houston, Texas, U.S.A., and **the arbitration shall be conducted in accordance with the arbitration procedures of the American [A]rbitration [A]ssociation** Houston Texas, U.S.A.

20.3 The arbitration award shall be binding on both parties.[136]

The AAA arbitration procedures incorporated into the contracts provide in relevant part:

1. Agreement of Parties

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association....

\* \* \* \* \* \*

2. Serving of Notice

(C) as directed by order of the court consistent with the law of the place where service is to be made."
28 U.S.C. § 1608.

---

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

\* \* \* \* \* \*

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

**136.** Excerpts of 1987 contract (emphasis added), Exhibit A to TCL's Petition to Confirm Arbitration Award; Exhibit A to TCL's Amended Petition to Confirm Arbitration Award; 1988 contract, Exhibit B to TCL's Petition to Confirm Arbitration Award; Exhibit B to Amended Petition to Confirm.

**Each party shall be deemed to have consented that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules; for any court action in connection therewith; or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard thereto has been granted to the party.**

The AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules.[137]

The procedures for "serving of notice" under the AAA Commercial Arbitration Rules, adopted as a result of the arbitration agreement between TCL and CNMC, constitute a "special arrangement for service" under the FSIA, thereby authorizing service by mail to CNMC. *See Marlowe v. Argentine Naval Comm'n,* 604 F.Supp. 703, 707–08 (D.D.C. 1985) (serving of notice provision in contract constituted "special arrangement for service" pursuant to the FSIA, 28 U.S.C. § 1608); *Saunders Real Estate Corp. v. Consulate General of Greece,* 1995 WL 598964, at *2 (D.Mass.1995) (same). Furthermore, it is clear that CNMC has not been denied a reasonable opportunity to be heard with regard to TCL's motion to confirm. Because TCL properly served CNMC in accordance with a special arrangement for service as provided in § 1608(b)(1), service in accordance with § 1608(b)(2) or (3) was unnecessary.

CNMC next argues that service was inadequate under the FAA. In ordinary circumstances 9 U.S.C. § 9 governs the service of petitions to confirm arbitral awards. Section 9 states in relevant part:

If the adverse party is a resident of the district within which the award was made ... service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

The statute does not provide for service of the respondent at any location that does not lie within a judicial district of the United States. Arguably, therefore, the mailing of the petition to CNMC's office outside of the United States was not appropriate service under section 9.

 However, the law is clear that 28 U.S.C. § 1608(b) provides the exclusive means by which service of process may be effected on an agency or instrumentality of a foreign state. *See Seramur v. Saudi Arabian Airlines,* 934 F.Supp. 48, 51–52 (E.D.N.Y.1996) (citing cases); 4A C. Wright & A. Miller, *Fed. Prac. & Proc.* § 1111, at 219 ("Section 1608 provides the exclusive procedure for service of process on a foreign state or its political subdivisions, agencies, or instrumentalities.") (citing legislative history).

Alternatively, the court concludes that requiring TCL to satisfy section 9 would require it to do the impossible. CNMC is not located in any judicial district in the United States, and United States marshals do not serve process outside of the United States. In these circumstances section 9 cannot be taken as the proper standard for service of process,[138] and "[r]ecourse must be had to

---

**137.** AAA Commercial Arbitration Rules (emphasis added), Exhibit C to TCL's Amended Petition to Confirm.

**138.** *See Matter of Arbitration Between InterCarbon Bermuda, Ltd. and Caltex Trading & Transport Corp.,* 146 F.R.D. 64, 67, 67 n. 3 (S.D.N.Y. 1993) (Section 12 of Title 9, which provides for service of a motion to vacate, modify, or correct an arbitral award on a nonresident by United States marshal, is "an anachronism not only because it cannot account for the internationalization of arbitration law subsequent to its enactment, but also because it cannot account for the subsequent abandonment of United States marshals as routine process servers.").

the Federal Rules of Civil Procedure." *Matter of Arbitration Between InterCarbon Bermuda, Ltd. and Caltex Trading & Transport Corp.*, 146 F.R.D. at 67.[139] The court concludes that the proper fallback provision for service of process is Fed.R.Civ.P. 4(j), which provides for service on an agency or instrumentality of a foreign state. This conclusion brings the court full-circle to its earlier holding that service was sufficient under the FSIA. Accordingly, CNMC's motion to dismiss for insufficiency of service of process will be denied.

## IV. Adequacy of TCL's Claims

CNMC argues that the court should dismiss TCL's claims under the FAA, the New York Convention, and the TGAA for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6). The focus of CNMC's 12(b)(6) motion is on TCL's claim under the FAA. CNMC argues that the FAA is limited by its terms to controversies "involving commerce" and that the contracts at issue did not involve commerce as contemplated by the Act. CNMC offers affidavit evidence[140] showing that the transaction involves two foreign corporations, TCL and CNMC, for the sale of equipment and services in Pakistan;[141] that the 1988 contract was signed in Karachi, Pakistan;[142] and that the transaction was financed by Pakistani banks.[143] CNMC argues that simply providing for arbitration of disputes in the United States does not create the necessary nexus to commerce, and that this transaction does not substantially affect commerce within the meaning of the FAA or the constitutional standards of *United States v. Lopez*, 514 U.S. 549, 557–59, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995). TCL responds that Congress's power to regulate foreign commerce is broader than its power to regulate interstate commerce, that Congress intended for the FAA to reach to the full extent of Congress' broad foreign commerce power, and that the contacts with foreign commerce and the instrumentalities of foreign commerce in this case satisfy this broad standard.

For the FAA to apply the court must find that the contract containing the arbitration provision "evidenc[es] a transaction involving commerce."[144] 9 U.S.C. § 2. As other courts have explained, this is not a rigorous inquiry; the contract need only be "related to" commerce to fall within the FAA.[145]

---

**139.** *See also Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1277 (2d Cir.1971).

**140.** In deciding whether there is a transaction involving commerce the court may look to the contracts, affidavits, and other discovery materials. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 n. 6, 87 S.Ct. 1801, 1804 n. 6, 18 L.Ed.2d 1270 (1967) (relying on affidavits to determine whether there is a transaction involving interstate commerce under the FAA); *Mesa Operating Ltd. Partnership v. Louisiana Intrastate Gas*, 797 F.2d 238, 243 (5th Cir. 1986) (same); *Snyder v. Smith*, 736 F.2d 409, 417 (7th Cir.) (affidavits and contract), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984); *Ideal Unlimited Serv. Corp. v. Swift–Eckrich, Inc.*, 727 F.Supp. 75, 76 (D.P.R.1989) (contract, affidavits, and the parties' business operations). Thus, the court may look to the contracts, affidavits, and deposition testimony provided by the parties to determine whether there was a transaction involving foreign commerce. To the extent that this may convert CNMC's 12(b)(6) motion to a motion under Rule 56 the court does so. Because each side has offered materials beyond the face of the pleadings, including the transcript of the entire arbitration hearing, which describes the relationship of the parties in great detail, neither side can be harmed by such a conversion. The court previously converted TCL's Motion to Confirm and CNMC's Motion to Vacate into cross-motions for summary judgment.

**141.** Zhang Affidavit at ¶ 16, Exhibit A to CNMC's Motion to Dismiss TCL's Amended Petition to Confirm Arbitration Award, Docket Entry No. 12.

**142.** Zhang Affidavit at ¶ 16.

**143.** Zhang Affidavit at ¶ 16.

**144.** The FAA defines "commerce" as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation...." 9 U.S.C. § 1.

**145.** *Del E. Webb Constr. v. Richardson Hosp. Authority*, 823 F.2d 145, 147–48 (5th Cir.1987) (rejecting the "substantial" contacts test in favor of "relating to" test in order to "implement[ ] the strong federal policy favoring arbitration"). *Ac-*

■ TCL offers uncontroverted affidavit and deposition testimony demonstrating that this transaction "related to" or "affected" foreign commerce within the meaning of the FAA. The initial transaction was negotiated at great length in Houston, Texas.[146] CNMC engaged a Texas corporation, N.E.M., Inc., as its agent in Texas in connection with the TCL negotiations.[147] N.E.M. provided CNMC with advice on how to negotiate with Drs. Khan and Halipoto.[148] In return, CNMC agreed to pay N.E.M. a commission for its work.[149] CNMC telexed various documents to TCL in the United States during the negotiations and sent a delegation from China to the United States to participate directly in the negotiations.[150] CNMC requested that TCL execute the initial "acceptance" of the project in the United States, and the 1987 contract was executed here. (The 1988 contract was executed in Karachi, Pakistan.)[151] TCL was owned by UI, a United States corporation. Drs. Khan and Halipoto reside in Texas, and the parties anticipated that TCL would supervise the project, in part, from the United States.[152] CNMC "routinely and repeatedly" communicated through international channels with TCL's representatives in the United States during the performance of the contract.[153]

cord, *Crawford v. West Jersey Health Sys.*, 847 F.Supp. 1232, 1240 (D.N.J.1994) ("The contract 'need have only the slightest nexus with interstate commerce.'") (quoting *Maxus, Inc. v. Sciacca*, 598 So.2d 1376 (Ala.1992)); *Arce v. Cotton Club of Greenville, Inc.*, 883 F.Supp. 117, 119 (N.D.Miss.1995) ("Section 2's requirements are met where contractual activity facilitates or affects commerce, even tangentially."); *Optopics Labs. Corp. v. Nicholas*, 947 F.Supp. 817, 821 (D.N.J.1996) (The FAA "applies to arbitration provisions in any contract that is in any way connected to interstate commerce."); *Caldwell v. KFC Corp.*, 958 F.Supp. 962, 972 (D.N.J.1997)(following *Crawford*); *Jones v. Tenet Health Network*, 1997 WL 180384, at *2 (E.D.La. April 7, 1997) (Section 2 "extends the reach of the FAA to all contractual activity which facilitates or affects commerce even tangentially.").

The Supreme Court has recently held that the term "evidencing a transaction involving commerce" in section 2 is to be broadly construed to extend the reach of the FAA to the full extent of Congress's power to regulate under the Commerce Clause. *Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 272–76, 115 S.Ct. 834, 839–40, 130 L.Ed.2d 753 (1995). *See also Atlantic Aviation, Inc. v. EBM Group, Inc.*, 11 F.3d 1276, 1280 (5th Cir.1994); *Snyder v. Smith*, 736 F.2d 409, 418 (7th Cir.1984); *Prograph Int'l, Inc. v. Barhydt*, 928 F.Supp. 983, 988 (N.D.Cal.1996); *Ideal Unlimited Services Corp. v. Swift–Eckrich, Inc.*, 727 F.Supp. 75, 76 (D.P.R. 1989).

Although the cases cited by the court interpret the FAA in cases involving interstate commerce, the same standards should apply to a foreign commerce analysis. Congress' power to regulate foreign commerce is broader than its authority to regulate interstate commerce. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 445–47, 447–48, 448 n. 13, 99 S.Ct. 1813, 1820, 1821, 1821 n. 13, 60 L.Ed.2d 336 (1979); *Brolan v. United States*, 236 U.S. 216, 221–22, 35 S.Ct. 285, 287, 59 L.Ed. 544 (1915); *Chemical Waste Mgt., Inc. v. Templet*, 770 F.Supp. 1142, 1152, 1152 n. 50 (M.D.La.1991) (citing cases), *aff'd*,

967 F.2d 1058 (5th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 357 (1993).

**146.** Affidavit of Dr. Sardar Khan, at p. 2, Exhibit 11 to Docket Entry No. 17; Transcript of arbitration hearing at vol. III, pp. 42–46.

**147.** Excerpts from Deposition of J.M. Li, at p. 30, Exhibit 12 to Docket Entry No. 17. Although the parties have not discussed this point in their briefing, it appears that N.E.M., Inc., was a subsidiary of, liaison for, or otherwise related to CNMC. A 1995 CNMC advertising brochure lists N.E.M., Inc., as a subsidiary in a corporate chart showing the structure of CNMC. (China National Machinery Import and Export 1995 at CNMC Batch Numbered pages 003614–15 & 003650–51, Exhibit C–2 to Vol. II to Clarke Deposition, Docket Entry No. 66) Moreover, during the arbitration hearing N.E.M. was described as CNMC's "liaison office" in the United States. (Transcript of arbitration hearing at vol. III, pp. 20–25, 51)

**148.** Li Deposition, at p. 61.

**149.** Li Deposition, at p. 32; Attachment 351 to Li Deposition.

**150.** Transcript of arbitration hearing at vol. III, pp. 43–46. *Cf. Atlantic Aviation*, 11 F.3d at 1280 (contract involves interstate commerce under the FAA where, among other things, the contract was negotiated in interstate commerce).

**151.** Khan Affidavit at p. 2.

**152.** Khan Affidavit at 2; Article 8.5 to 1987 and 1988 contracts. *Cf. Snyder*, 736 F.2d at 418 (contract involved interstate commerce under the FAA where real estate was in Texas and partners lived in, and the partnership was managed from, Illinois).

**153.** Khan Affidavit at 2. *Cf. Mesa*, 797 F.2d at 243 (contract involved interstate commerce under the FAA where corporation crossed state

Finally, TCL purchased some of the necessary chemicals for the project from a United States corporation, as well as from the foreign subsidiary of a United States corporation.[154] Based on these facts the court concludes that the transaction evinced a contract involving commerce within the meaning of the FAA.[155]

CNMC's motion to dismiss the claims under the New York Convention and the TGAA merely adopts the arguments previously rejected by the court in part II of this Memorandum and Order. Accordingly, the motion to dismiss will be denied as to each of TCL's claims.

## V. Confirmation of the Arbitration Award

TCL seeks confirmation of the arbitration award under the FAA, the TGAA, and the New York Convention. CNMC seeks to vacate the award under the FAA and the TGAA and to avoid recognition and enforcement of the award under Article V of the New York Convention.[156] Specifically, CNMC argues that TCL procured the award by fraud or undue means under the FAA, 9

U.S.C. § 10(a)(1), and the TGAA, Tex.Rev. Civ. Stat. Ann. art. 237, § A(1) (redesignated as Tex. Prac. & Rem.Code § 171.014); and that the arbitrators engaged in conduct that substantially prejudiced CNMC's right to a fundamentally fair hearing under FAA § 10(a)(3), TGAA art. 237, § A(4), and Article V, §§ 1(b) & 2(b) of the Convention.

## A. Confirmation under the FAA and TGAA

Although both parties rely on the TGAA, they do not discuss whether the TGAA applies to this case. Under the Supremacy Clause of the United States Constitution the FAA preempts all otherwise applicable state laws, including the TGAA. U.S. Const. art. VI cl. 2; *Atlantic Aviation, Inc. v. EBM Group, Inc.*, 11 F.3d 1276, 1279 (5th Cir.1994). The FAA applies to "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Because the court has concluded that the transaction between TCL and CNMC involved commerce as defined by the FAA, federal arbitration law governs the

lines from Texas to Louisiana to engage in operations under the contract, received all communications related to the contract and all payments under the contract in Texas, and conducted money-raising activity in Texas); *Mutual Reinsurance Bureau v. Great Plains Mutual Ins. Co.*, 750 F.Supp. 455, 463 (D.Kan.1990), *rev'd on other grounds*, 969 F.2d 931 (10th Cir.1992) (contract involved interstate commerce under the FAA where, among other factors, business relating to the transaction was conducted by interstate telephone and interstate mail); *Arce v. Cotton Club of Greenville*, 883 F.Supp. at 120 (plaintiffs "regularly used instruments of interstate commerce, e.g., the United States mail and public telephone lines").

**154.** Khan Affidavit at p. 2. *Cf. Thomas O'Connor & Co. v. Insurance Co. of N. Am.*, 697 F.Supp. 563, 566 (D.Mass.1988) (agreement evidenced a transaction involving interstate commerce where, among other things, the materials purchased for the contract were ordered and shipped from outside of the state in which work was to be performed).

**155.** The court's conclusion is not undermined by the two older district court cases cited by CNMC in support of its position. *See The Volsinio*, 32 F.2d 357 (E.D.N.Y.1929); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith*, 253 F.Supp. 359

(S.D.N.Y.1966). In *The Volsinio* the court held that a shipment of sugar between foreign countries did not constitute "commerce" among the several states or with foreign nations within the meaning of 9 U.S.C. § 1. An appeal to the Second Circuit resulted in a denial of a writ of prohibition and left the question open. The Court of Appeals said that the correctness of the district court's construction of the FAA did not have to be decided because the contract of the parties contained in the charter party antedated the effective date of the Act and, thus, the Act did not apply to it. The commerce issue was specifically held to be moot. *Ex Parte De Simone*, 36 F.2d 773, 773 (2d Cir.1929). *Sinva* is also distinguishable. There, the only connection with foreign commerce was the fact that the party who entered into the contracts on the plaintiff's behalf was a United States corporation that had no other connection to the contract. 253 F.Supp. at 363. In this case the contacts with foreign commerce and the instrumentalities of foreign commerce are far greater. Furthermore, *The Volsinio* and *Sinva* appear to represent a narrow conception of the commerce clause that is inconsistent with the more recent cases relied on by the court.

**156.** At the January 26, 1996, hearing the court converted the motions into cross-motions for summary judgment. Transcript of January 26, 1996, hearing at p. 35.

court's review. *See Atlantic Aviation,* 11 F.3d at 1280.[157]

The standard of review of an arbitration award under the FAA is one of deference. *Gulf Coast Indus. Workers Union v. Exxon Co.,* 991 F.2d 244, 248 (5th Cir.), *cert. denied,* 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993); *Psarianos v. Standard Marine, Ltd.,* 790 F.Supp. 134, 135 (E.D.Tex.1992), *aff'd,* 12 F.3d 461 (5th Cir.), *cert. denied,* 511 U.S. 1142, 114 S.Ct. 2164, 128 L.Ed.2d 887 (1994). The FAA mandates a summary procedure modeled after federal motion practice to resolve petitions to confirm arbitration awards. *See* 9 U.S.C. § 9. Judicial review of arbitrators' decisions is "extraordinarily narrow" under the FAA; it is limited to the statutory exceptions enumerated in the FAA. *Gulf Coast Indus. Workers Union v. Exxon Co.,* 70 F.3d 847, 850 (5th Cir.1995); *Forsythe Int'l. S.A. v. Gibbs Oil Co. of Texas,* 915 F.2d 1017, 1020 (5th Cir. 1990). In reviewing an arbitration award the court asks whether the arbitration proceedings were "fundamentally unfair." *Gulf Coast,* 70 F.3d at 850. This limited judicial review reflects the desire to "avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111–12 (2d Cir.1993). Thus, "whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so." *Forsythe,* 915 F.2d at 1022. A party moving to vacate an arbitration award has the burden of proof. *Spector v. Torenberg,* 852 F.Supp. 201, 206 (S.D.N.Y.1994).

### 1. *Was the award procured by fraud or undue means?*

CNMC argues that as a result of TCL's untimely production of the "ChemCon report" on June 21, 1995, TCL procured the arbitration award by fraud or undue means.[158] CNMC argues that TCL failed to use due diligence and good faith in producing the ChemCon report and that the late production of the report prevented CNMC's counsel from fully cross-examining TCL's witnesses and hindered CNMC's witnesses from preparing for their testimony at the arbitration hearing. After carefully consid-

---

**157.** Neither party could be prejudiced by this decision. The TGAA's vacatur provision on which CNMC relies, Tex.Rev.Civ. Stat. Ann. art. 237, is "substantially similar to section 10 of the Federal Arbitration Act." *Tuco, Inc. v. Burlington Northern R.R. Co.,* 912 S.W.2d 311, 315 (Tex. App.—Amarillo 1995), *modified on other grounds and remanded,* —— S.W.2d —— 1997 WL 336314 (Tex. June 20, 1997). CNMC seeks vacatur for fraud or undue means pursuant to article 237, § A(1), which is virtually identical to section 10(a)(1) of the FAA. Under both statutes a court may vacate an arbitration award where "the award was procured by corruption, fraud, or [other] undue means." Tex.Rev.Civ. Stat. Ann. art. 237, § A(1); 9 U.S.C. § 10(a)(1). CNMC also seeks vacatur under article 237, § A(4), which provides for vacatur when the arbitrators "refused to postpone the hearing on good cause shown, or refused to hear material evidence[,] or otherwise conducted the hearings contrary to the provisions of article 228 so as to prejudice substantially the rights of a party." Article 228 requires the arbitrators to set a time and place for the hearing and notify the parties of the time and place. Tex.Rev.Civ. Stat. Ann. art. 228, § A. The arbitrators are given the authority to postpone the hearing at the request of a party and for good cause. *Id.* The parties are also entitled to a hearing, to present evidence material to the controversy, and to cross-examine witnesses at the hearing. *Id.* Section 10(a)(3) of the FAA provides for vacatur where the arbitrators "were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party may have been prejudiced." These two provisions are virtually identical, and the final clause of article 237, § A(4) may actually be narrower than the final clause of § 10(a)(3).

Furthermore, the parties have failed to cite the court to any authority interpreting article 237 of the TGAA. In its motion to vacate CNMC relies solely on cases interpreting section 10(a) of the FAA. TCL does not object to CNMC's use of federal law and also relies exclusively on cases interpreting the FAA.

**158.** In its Motion to Vacate CNMC alleges that TCL's actions amounted to "outright fraud." (CNMC's Motion to Vacate at p. 13) At a January 26, 1996, hearing CNMC's counsel informed the court that this allegation was directed solely to TCL's alleged "undue means" within the meaning of the statute. (Transcript of January 26, 1996, hearing at p. 7) To avoid any confusion about the extent of CNMC's allegations or of the court's holding the court will consider both the fraud and undue means allegations.

ering the evidence and the parties' arguments the court concludes that CNMC has failed to show the award was procured through fraud or undue means.

 Under the FAA a party who alleges that an arbitration award was procured through fraud or undue means must demonstrate that the improper behavior was (1) not discoverable by due diligence before or during the arbitration hearing, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence. *E.g., Gingiss Int'l, Inc. v. Bormet,* 58 F.3d 328, 333 (7th Cir.1995); *A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1404 (9th Cir.1992), *cert. denied,* 506 U.S. 1050, 113 S.Ct. 970, 122 L.Ed.2d 126 (1993); *Dean Foods Co. v. United Steel Workers of Am.,* 911 F.Supp. 1116, 1124 (N.D.Ind.1995); *Shearson Hayden Stone, Inc. v. Liang,* 493 F.Supp. 104, 108 (N.D.Ill.1980), *aff'd,* 653 F.2d 310 (7th Cir.1981). Although "fraud" and "undue means" are not defined in section 10(a) of the FAA, courts interpret the terms together. *See Shearson Hayden Stone,* 493 F.Supp. at 108. Fraud requires a showing of bad faith during the arbitration proceedings, such as bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence, *Indocomex Fibres Pte., Ltd. v. Cotton Co. Int'l, Inc.,* 916 F.Supp. 721, 728 (W.D.Tenn.1996); *Dean Foods v. United Steel Workers,* 911 F.Supp. at 1124. Similarly, undue means connotes behavior that is "immoral if not illegal" or otherwise in bad faith. *A.G. Edwards,* 967 F.2d at 1403–04; *Shearson Hayden Stone,* 493 F.Supp. at 108.

*See also American Postal Workers Union v. United States Postal Serv.,* 52 F.3d 359, 362 (D.C.Cir.1995) (In the labor arbitration context "undue means must be limited to an action by a party that is equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator or other improper influence.").[159] Section 10(a)(1) also requires a nexus between the alleged fraud or undue means and the basis for the arbitrators' decision. *Forsythe,* 915 F.2d at 1022; *A.G. Edwards,* 967 F.2d at 1403.

 The ChemCon report was completed in October of 1986 by Chemical Consultants Pakistan, Limited, for the Industrial Development Bank of Pakistan ("the IDBP"). The report was not created for TCL. The report studied the feasibility of hydrogen peroxide production in Pakistan. In late 1986 Drs. Halipoto and Khan approached the IDBP about investment opportunities in Pakistan, and the IDBP provided them with a copy of the report in February of 1987 as one of several possible opportunities.[160] TCL provided a partial copy of the report to CNMC in 1987 during contract negotiations between the parties.[161]

The arbitrators ordered the parties to produce by February 1, 1995, all documents to be relied on or offered at the hearing.[162] Counsel for TCL requested that Drs. Khan and Halipoto locate and produce all documents "regardless of whether or not you think they are important or helpful or harmful."[163] Dr. Khan testified that he attempted

---

**159.** CNMC argues that the court should look to cases applying Fed.R.Civ.P. 60(b)(3) when interpreting undue means. In light of ample authority defining undue means under the FAA the court is not persuaded by CNMC's argument. The court also notes that the Rule 60(b)(3) cases on which CNMC relies are distinguishable on several grounds. In most of the cases the movant under Rule 60(b)(3) did not learn of withheld discoverable material until after a judgment was entered. TCL turned over the ChemCon report before the arbitration hearing commenced. Also, in most of the Rule 60(b)(3) cases the conduct amounted to outright fraud. There is no evidence of fraudulent conduct by TCL or its counsel.

**160.** Transcript of arbitration hearing, at vol. III, pp. 14–19; at vol. IV, p. 127; at vol. V, pp.

160, 167; letter from Dr. Sardar Khan to the IDBP, Exhibit 1 to Exhibit Vol. 1 to CNMC's Motion to Vacate Arbitration, Docket Entry No. 14.

**161.** Deposition of Xu Da Cheng at pp. 34–36, Exhibit 9 to Exhibit Vol. 1 to CNMC's Motion to Vacate.

**162.** Letter from AAA dated December 14, 1994, Exhibit 11 to Exhibit Vol. 1 to CNMC's Motion to Vacate; Exhibit 1 to TCL's Response to CNMC's Supplemental Brief in Support of the Motion to Vacate, Docket Entry No. 68.

**163.** Letter from Ronald D. Secrest to S.D. Khan and M. Halipoto dated December 15, 1995, Exhibit 2 to TCL's Response to CNMC's Supplemental Brief.

to locate all relevant materials.[164] TCL produced over 40,000 pages of documents.[165] The complete ChemCon report was not among the documents produced. Between March and May of 1995 CNMC made four document requests seeking, among other things, the complete report.[166] Counsel for TCL responded that CNMC already had a copy of the ChemCon report, referring to the copy of the partial report that TCL initially provided to CNMC in February of 1987 and that TCL was planning to use as its Exhibit 1 for the arbitration hearing.[167]

Counsel for TCL assigned a paralegal, Karen Serwan, to assist in production of all documents.[168] Ms. Serwan testified that she or counsel for TCL forwarded all document requests directly to TCL, that she or counsel communicated with TCL about the requests, and that TCL's principals produced what they were able to locate and agreed to continue looking for the rest.[169] She did not specifically inquire about the full ChemCon report or search through the 40,000 pages of documents for potentially relevant materials.[170]

The complete ChemCon report was located by Dr. Khan on June 20, 1995, the day before the arbitration hearing began. That day, while he was cleaning out his files related to other investment opportunities in Pakistan, Dr. Khan located a copy of the complete report that he had misfiled among those unrelated documents.[171] He turned over the report to counsel for TCL that afternoon. TCL's counsel added the report as its new Exhibit 1 and produced copies that night for TCL, CNMC, and the arbitrators. These copies were provided to CNMC and the arbitrators the next morning on the first day of arbitration.[172]

Because CNMC has not shown that the arbitration award was procured by fraud or undue means, it has failed to satisfy the third element for setting aside an award under 9 U.S.C. § 10(a)(3). CNMC has not offered any evidence showing that TCL's conduct regarding the production of the ChemCon report was fraudulent, immoral, illegal, or otherwise in bad faith. The uncontroverted evidence shows that the complete ChemCon report was located accidently after it was inadvertently misfiled by Dr. Khan. CNMC offers no evidence that Dr. Khan or Halipoto, anyone else at TCL, or its attorneys intentionally or even recklessly delayed or otherwise attempted in any way to prevent production of the report or failed to undertake a good faith effort to produce all documents responsive to the arbitrators' discovery order or CNMC's document requests. Accidently (or even negligently) failing to discover the complete ChemCon report until·one day before the hearing does not rise to the level of conduct constituting fraud or undue means. *See A.G. Edwards v. McCollough*, 967 F.2d at 1403 (holding that "mere sloppy or overzealous lawyering" does not constitute undue means).

CNMC also fails to meet the first element of the three-part test for showing fraud or undue means under 9 U.S.C. § 10(a)(3) because it has not shown that TCL's allegedly

---

**164.** Deposition of Dr. Sardar Khan at pp. 50, 68, Exhibit A to CNMC's Supplemental Brief in Support of Motion to Vacate, Docket Entry No. 63.

**165.** Deposition of Dr. Sardar Khan at p. § 1.

**166.** March 23, 1995, Deposition of Mohammed Halipoto at pp. 10–16, 57–58, 204–05, Exhibit 12 to Exhibit Vol. 1 to CNMC's Motion to Vacate; April 7, 1995, letter from Robert E. Campbell to Eric J.R. Nichols, Exhibit 13; April 24, 1995, letter from Steven S. Fleischman to Eric J.R. Nichols, Exhibit 14; May 10, 1995, letter from Steven S. Fleischman to Ronald D. Secrest, Exhibit 15.

**167.** Letter from Ronald D. Secrest to Stephen S. Fleischman, Attachment 7 to Khan Deposition; Serwan Deposition at pp. 26, 28–29; Exhibit List

of Claimant Trans Chemical Limited, Attachment 4 to Serwan Deposition.

**168.** Deposition of Karen Serwan, Exhibit B to CNMC's Supplemental Brief; December 15, 1994, letter from Ronald D. Secrest to S.D. Khan and M. Halipoto, Exhibit 2 to TCL's Response to CNMC's Supplemental Brief.

**169.** Serwan Deposition at pp. 41–43; Khan Deposition at pp. 52–53.

**170.** Serwan Deposition at pp. 42–44.

**171.** Khan Deposition at pp. 23–40, 49–52, Exhibit A to CNMC's Supplemental Brief.

**172.** Serwan Deposition at pp. 33–40.

improper behavior was not discoverable by due diligence before or during the arbitration hearing. TCL's lawyers first received the complete report the day before the hearing and provided it to CNMC the next day, before the arbitration hearing started, and two weeks before CNMC presented its case to the arbitrators. During the arbitration CNMC brought the late production of the report to the attention of the arbitrators. CNMC cross-examined Dr. Khan, over TCL's objections, about the delay in the report's production and cross-examined TCL witnesses about the contents of the complete report.[173] Where the grounds for fraud or "undue means is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple." *A.G. Edwards*, 967 F.2d at 1404; *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, 1989 WL 115941, at *3 (S.D.N.Y. Sept.27, 1989).

Although CNMC could not have been expected to know during the arbitration all of the facts surrounding the delayed production of the report, it could have sought relief from the arbitrators to investigate the matter fully and to incorporate the facts of such an investigation into its defense. However, CNMC did not ask the arbitrators for such relief or for a continuance. CNMC also failed to object to the admission of the complete report when it was first offered into evidence.[174] Although the arbitrators permitted the parties to file post-hearing briefs, CNMC did not ask to reopen the hearing or to otherwise supplement the record to incorporate any additional expert opinions based on the ChemCon report. By failing to seek any relief from the arbitrators CNMC cannot now complain about the late production of the ChemCon report. *See Vita Food Prod.,*

*Inc. v. Sklar*, 1995 WL 360696 (N.D.Ill.1995) (although movant claimed that threat against witness of which movant was aware constituted undue means and required vacatur of award "the court cannot fault the Panel for not doing something the parties never sought in the first place"). *See also Gateway Technologies, Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993, 998 (5th Cir.1995) ("A party cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court.").

### 2. Did the arbitrators engage in conduct that Prejudiced CNMC's rights to a fundamentally fair hearing?

CNMC next argues that the arbitrators engaged in conduct that prejudiced its rights to a fundamentally fair hearing under 9 U.S.C. § 10(a)(3). Specifically, CNMC alleges that the arbitrators issued an irrational scheduling order, disregarded CNMC's suggestion of bankruptcy, failed to rule on CNMC's limitations and choice of law arguments, and failed to issue a written opinion explaining the rationale for the award. Section 10(a)(3) requires vacatur "[w]here the arbitrators were guilty of misconduct in refusing to postpone that hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).

### a. The scheduling order

The arbitration was commenced on May 13, 1994, and CNMC first appeared on June 17, 1994. The arbitrators issued an initial scheduling order on December 14, 1994, requiring document production by February 1, 1995, and setting a hearing date on May 15,

---

**173.** Transcript of arbitration hearing at vol. IV, pp. 124–33; at vol. V, pp. 159–60, 164–89.

**174.** Transcript of arbitration hearing, at vol. III, p. 16. In CNMC's Reply to TCL's Response to CNMC's Motion to Vacate at p. 4, n. 1, Docket Entry No. 25, CNMC argues that it did object to TCL's first "offensive" use of the ChemCon report. CNMC first objected to the use of the report with one of TCL's expert witnesses on June 30, 1995, and the objection was overruled.

(Transcript of arbitration hearing at vol. VIII, pp. 81–82) However, on June 23, 1995, the complete report was first introduced into evidence without objection and used offensively by TCL's counsel with its own witness, Dr. Khan. (Transcript of arbitration hearing, at vol. III, pp. 15–18) CNMC then cross-examined Dr. Khan using the admitted complete report on June 26, 1995. (Transcript of arbitration hearing at vol. IV, pp. 124–33)

1995.[175] TCL alleges and CNMC does not deny that CNMC did not take its first deposition until March 22, 1995. CNMC moved for a continuance on April 5, 1995, and again on April 10, 1995, arguing that the schedule was "impractical and one not designed to afford CNMC a fair opportunity to defend itself properly against the fact-intensive claims of TCL" and alleging that TCL would not join the motion because it was "apparently seek[ing] to have CNMC and the Arbitration Panel 'rush to judgment.'"[176] CNMC complained of various logistical problems it encountered because of the international nature of the case and the unavailability of TCL's witnesses for deposition and sought a continuance until at least July 24, 1995.[177] On May 1, 1995, the arbitrators ruled that discovery should be completed by June 2, 1995, granted a continuance until June 21, 1995, and warned that "[a]ny further postponements will be looked upon with great disfavor by the Arbitration Panel."[178] CNMC argues that "[t]he foregoing chronology of the arbitrators' pre-trial conduct demonstrates that TCL obtained exactly what it wanted, a rush to judgment which facilitated its discovery abuse to unduly procure an award against CNMC."[179]

The court concludes that the arbitrators' scheduling order did not deprive CNMC of a fair hearing. CNMC requested and received a continuance from the arbitrators. CNMC did not request a further extension from the arbitrators or present any evidence of suffi-

cient good cause to warrant further delay in the hearing, and CNMC proceeded to arbitrate the case on June 21, 1995, without further comment. CNMC never notified the arbitrators that it had been unable to prepare its case properly, and had in fact expressed to TCL on June 5, 1995, that it was "fully prepared to defend itself and advance its own claims."[180] At the end of TCL's presentation of its case CNMC's counsel stated that the arbitration panel had conducted the hearing in a manner of "propriety and fairness."[181] CNMC has also failed to identify what additional discovery or preparation it would have undertaken, and it is "idle speculation to assume that the result would have been different" had CNMC been given additional time. See *Grovner v. Georgia–Pacific Corp.*, 625 F.2d 1289, 1290 (5th Cir. Unit B 1980).

b. The stay in the Halipoto bankruptcy

 On May 30, 1995, CNMC filed a "Suggestion of Bankruptcy and Notice of Stay of Arbitration Proceedings" with the arbitration panel.[182] CNMC alleged that it was prevented from proceeding with discovery or the arbitration hearing because of the automatic stay imposed in the pending bankruptcy of Dr. Halipoto. On June 8, 1995, counsel for the Trustee in bankruptcy informed the arbitrators and the parties that it was the Trustee's position that the arbitration was stayed.[183] The next day the arbitrators ruled, however, that the hearing would

---

**175.** AAA December 14, 1994, Scheduling and Discovery Order, Exhibit 11 to Exhibit Vol. 1 to CNMC's Motion to Vacate. TCL made its initial witness list and documents available to CNMC for review on December 2, 1994, before the arbitrators' order and before the arbitrators' February 1, 1995, production deadline. (December 2, 1994, letter from Ronald D. Secrest to Robert E. Campbell and Yu Qiu Zhang, Exhibit 4 to TCL's Response to CNMC's Motion to Vacate, Docket Entry No. 18)

**176.** CNMC's Renewed Motion for Continuance of the Discovery Cutoffs and the arbitration hearing, Exhibit 35 to Exhibit Vol. 2 to CNMC's Motion to Vacate.

**177.** CNMC's Renewed Motion for Continuance of the Discovery Cutoffs and the Arbitration Hearing.

**178.** May 1, 1995, AAA letter to Counsel for All Parties, Exhibit 36 to Exhibit Vol. 2 to CNMC's Motion to Vacate.

**179.** CNMC's Motion to Vacate Arbitration Award at p. 21.

**180.** June 5, 1995, letter from Roger Rosendahl to Ronald D. Secrest, Attachment D to Affidavit of Roger W. Rosendahl, Exhibit 7 to Exhibit Vol. 1 to CNMC's Motion to Vacate.

**181.** Transcript of arbitration hearing at vol. VIII, p. 206.

**182.** Suggestion of Bankruptcy and Notice of Stay of Arbitration Proceedings, Exhibit 37 to Exhibit Vol. 2 to CNMC's Motion to Vacate.

**183.** June 8, 1995, letter from Steven Leyh to AAA and All Parties, Exhibit 38 to Exhibit Vol. 2 to CNMC's Motion to Vacate.

proceed as scheduled.[184] CNMC argues that the arbitrators thus forced CNMC "to walk an imperceptibly thin line between compliance with the arbitrators' order to go forward and avoidance of the automatic stay."[185] CNMC overlooks the fact that on June 9, 1995, the very day the arbitrators ruled that the hearing should go forward, and again on June 15, 1995, the bankruptcy court refused to stay the arbitration hearing, concluding that the automatic stay did not prevent the arbitration from proceeding.[186] The court concludes that the arbitrators did not incorrectly disregard CNMC's argument that the automatic stay prevented the arbitration from going forward. The court also concludes that CNMC has failed to show that it was harmed by the arbitrators' decision to proceed.

### c. The arbitrators' rulings

 CNMC argues that the arbitrators failed to rule on statute of limitations or choice of law questions or to issue a written, reasoned opinion. All of these claims lack merit. CNMC argues that the arbitrators refused to rule on its statute of limitations defense on the first day of the hearing and again at the end of TCL's case-in-chief and failed to decide certain choice of law issues,[187] and that the arbitrators' failure to rule on these issues prejudiced CNMC's defense because "a timely ruling would have permitted CNMC to fully and fairly defend itself on the real issues in the case."[188] The court is not persuaded by this argument because CNMC was not entitled to a preliminary ruling on every legal issue in the case. An arbitration proceeding is less formal than judicial litigation. *Grovner*, 625 F.2d at 1290. "Parties to voluntary arbitration may not superimpose rigorous procedural limitations on the very process designed to avoid such limitations." *Forsythe*, 915 F.2d at 1017, 1022. "Arbitration need not follow all the 'niceties' of the federal courts; it need only provide a fundamentally fair hearing." *Grovner*, 625 F.2d at 1290. "If the arbitrators' decision rests on an adequate basis, then complaints that the panel failed to address all issues presented will not render the proceedings 'fundamentally unfair' or justify disturbing the award." *Forsythe*, 915 F.2d at 1023. CNMC does not allege that the arbitrators' decision "to carry these issues" until the end of arbitration violated AAA arbitration rules or that the arbitrators' decision rested on an inadequate basis.

 CNMC also argues that despite two requests, the arbitrators failed to issue a written, reasoned opinion. "It has long been settled," however, "that arbitrators are not required to disclose or explain the reasons underlying an award." *Antwine v. Prudential Bache Securities*, 899 F.2d 410, 412 (5th Cir.1990); AAA Comm. Arb. R. 42.[189] The arbitrators' award in this case is sufficient.

### 3. *Conclusion*

 CNMC has failed to show that the arbitration award was procured by fraud or

---

184. June 9, 1995, letter from AAA to All Parties, Exhibit 39 to Exhibit Vol. 1 to CNMC's Motion to Vacate.

185. CNMC's Motion to Vacate at p. 22.

186. On June 9, 1995, CNMC filed an Emergency Motion for Temporary Restraining Order with the bankruptcy court, alleging that the pending arbitration was stayed and requesting a TRO to prevent the arbitration from proceeding. (Docket Entry No. 3 to Adversary No. 95–4383) Bankruptcy Judge Karen Brown denied the motion. (Docket Entry No. 4 to Adversary No. 95–4383) On June 14, 1995, the Trustee also filed an Emergency Motion for TRO (Docket Entry No. 6 to Adversary No. 95–4383), which Judge Brown denied on June 15, 1995. (Docket Entry Nos. 10–11 to Adversary No. 95–4383)

187. Transcript of arbitration hearing at vol. I, pp. 108–09; at vol. VIII, pp. 206–07.

188. CNMC's Motion to Vacate at pp. 23, 24.

189. To the extent that CNMC's arguments may be considered as implied attacks on the correctness of any legal or factual determinations by the arbitrators, CNMC is not entitled to relief based on such arguments. A mistake of law or fact is insufficient to set aside an arbitration award. A federal court will not review factual findings or merit determinations made in an arbitral award unless the award is in "manifest disregard" of the law. *Wilko v. Swan*, 346 U.S. 427, 435–38, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953), *overruled on other grounds*, *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Such an allegation has neither been made nor established in this case.

undue means or that the complained of actions by the arbitrators denied it a fundamentally fair hearing.[190] The FAA provides that "at any time within one year after the award is made any party to the arbitration may apply to the court ... for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [Title 9]." 9 U.S.C. § 9. Having rejected the claims in CNMC's motion to vacate the court will grant TCL's motion to confirm and enter judgment in favor of TCL against CNMC based on the arbitration award.

## B. Confirmation under the New York Convention

 TCL also seeks to confirm the arbitral award pursuant to the New York Convention. *See* 9 U.S.C. § 207 ("Within 3 years after an arbitral award ... is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.").[191] A party seeking confirmation of an award under the Convention must supply with its application the original award and original agreement between the parties, or certified copies of those documents. Convention, Art. IV. TCL has supplied certified copies of

these documents to the court.[192] Under section 207 the court must confirm the award unless CNMC alleges and proves one of the reasons for denying enforcement provided in Article V of the Convention. *Matter of Arbitration Between Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F.Supp. 907, 909 (D.D.C.1996). The Convention mandates a summary procedure modeled after federal motion practice to resolve motions to confirm. As the party opposing confirmation, CNMC bears the burden of proof of establishing an Article V reason prohibiting confirmation. *See Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 336 (5th Cir.1976). Absent "a convincing showing" that one of these narrow exceptions applies the arbitral award will be confirmed. *Fitzroy Eng'g, Ltd. v. Flame Eng'g, Inc.*, 1994 WL 700173, at *3 (N.D.Ill.Dec.13, 1994); *Biotronik Mess–Und Therapiegeraete GmbH & Co. v. Medford Medical Instr. Co.*, 415 F.Supp. 133, 136 (D.N.J.1976). *See also Indocomex Fibres Pte., Ltd. v. Cotton Co. Int'l, Inc.*, 916 F.Supp. 721, 726 (W.D.Tenn.1996); *Geotech Lizenz AG v. Evergreen Sys.*, 697 F.Supp. 1248, 1252 (E.D.N.Y.1988).

 CNMC alleges that confirmation should be refused under Article V, §§ 1(b) and 2(b) of the Convention because the arbitrators' conduct discussed in part V.A. of this

190. In CNMC's Reply to TCL's Response to CNMC's Motion to Vacate at pp. 13–14, CNMC requests that if the court is inclined to deny its claims regarding the arbitrators' alleged improprieties, the court should first permit CNMC to conduct additional discovery on these issues. Specifically, CNMC suggests a discovery order requiring the AAA to produce copies of scheduling orders and arbitration awards in cases similar to this one so that CNMC may attempt to show that other arbitration panels would have granted a continuance or imposed a less strenuous discovery order, would have issued interim rulings on issues such as the statute of limitations or choice of law, or would have issued written, reasoned opinions explaining the basis for the award. The court rejected this request during the January 26, 1996, hearing (Transcript of January 26, 1996, hearing at p. 30) and reiterates its rejection. Allowing extensive discovery into the procedures of the arbitration panel would frustrate the primary goal of arbitration, the fast and efficient resolution of disputes, and would unduly burden the AAA. Except in unusual circumstances "the district court is directed to summarily dispose of [vacatur] motions with lim-

ited factual inquiry to effect the intention of the parties to resolve their dispute through arbitration." *Legion Ins. Co. v. Ins. General Agency, Inc.*, 822 F.2d 541, 543 n. 3 (5th Cir.1987). The court has already allowed extensive inquiry into the circumstances surrounding the production of the ChemCon report. Further discovery beyond the scope of the pleadings, the arbitration record, and the discovery already allowed is unnecessary. *See id.* at 542–43.

191. The court has the power to confirm the arbitration award under both the FAA and the New York Convention. *Spector v. Torenberg*, 852 F.Supp. 201, 205 (S.D.N.Y.1994) (An arbitral award is enforceable under the Convention even if it is also enforceable under the FAA.); *La Reunion Francaise v. Martin*, 1995 WL 338291, at *2 (S.D.N.Y. May 31, 1995), *aff'd mem.*, 101 F.3d 682 (2d Cir.1996); *Nat'l Educ. Corp. v. Martin*, 1995 WL 622267, at *3 (N.D.Ill. Oct.20, 1995).

192. Exhibits B & E to TCL's Amended Petition to Confirm Arbitration Award.

Memorandum and Order prohibited CNMC from fully and fairly presenting its case to the panel. Section 1(b) of the Convention allows confirmation of an award to be refused if the "party against whom the award is invoked was not given proper notice . . . of the arbitration proceedings or was otherwise unable to present his case." Section 2(b) provides a defense to confirmation where "the recognition or enforcement of the award would be contrary to the public policy of that country." Convention, Art. V, § 2(b).

Because CNMC has not shown how enforcement of the arbitration award would violate public policy, and because CNMC's invocation of Article V, § 2(b) is duplicative of its defense under Article V, § 1(b), the court will treat the two defenses together.[193] Based on the court's reasons for denying CNMC's motion to vacate under the FAA, the court concludes that CNMC is not entitled to avoid confirmation under the Convention. Article V, § 1(b) of the Convention "essentially sanctions the application of the forum state's standards of due process,"[194] and should be narrowly construed to give effect to the Convention's goal of encouraging the timely and efficient enforcement of awards. *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 976 (2d Cir. 1974). " 'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.' " *Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 146 (2d Cir.1992) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure. By agreeing to arbitration CNMC subjected itself to its advantages and disadvantages. *See RAKTA,* 508 F.2d at 975. As the court

has previously concluded, CNMC has failed to show that the arbitrators issued an irrational scheduling order, erred in failing to impose an automatic stay on the proceedings or in failing to rule on interim issues raised by CNMC, or failed to issue a written, reasoned award. Because there is no evidence that CNMC was denied the opportunity to be heard in a meaningful time and in a meaningful manner, the court concludes that CNMC was not denied its due process rights under the Convention. Because CNMC has not persuaded the court that it has any basis for avoiding confirmation under the New York Convention, the court will also grant TCL's motion to confirm the arbitration award under the Convention.

### VI. *Remaining Motions in Civil Action No. H–95–4114*

Having concluded that TCL is entitled to confirmation of the award under the FAA and the New York Convention the court must now rule on TCL's remaining motions for sanctions, attorney's fees, and prejudgment and postjudgment interest.

### A. Sanctions

TCL seeks sanctions under Rule 11 and 28 U.S.C. § 1927. The goal of Rule 11 is to discourage dilatory and abusive litigation tactics and eliminate frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process. See Fed.R.Civ.P. 11; *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 870 (5th Cir.1988) (*en banc*); *FDIC v. Calhoun,* 34 F.3d 1291, 1296 (5th Cir.1994). As long as an attorney's filings meet the test of "objective reasonableness under the circumstances" and are not imposed for improper purposes sanctions are not warranted. *See Calhoun,* 34 F.3d at 1296. "[N]ot all unsuccessful legal arguments are frivolous or warrant sanc-

---

**193.** The public policy limitation in the Convention is construed very narrowly and applied only where enforcement would violate the forum state's most basic notions of morality and justice. *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512, 516 (2d Cir.1975); *Indocomex,* 916 F.Supp. at 727; *Fitzroy Eng'g,* 1994 WL 700173, at *3. To the extent that CNMC makes a separate claim under Article V, § 2(b), neither the failure to produce the ChemCon report nor the alleged misconduct

by the arbitrators rises to the level of a public policy violation.

**194.** *Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 145–46 (2d Cir.1992) (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 975 (2d Cir.1974)).

tion." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991).

Rule 11 is not the only means of preventing attorneys from abusing the legal process. 28 U.S.C. § 1927 authorizes the court "to sanction an attorney (as distinguished from a party) who unnecessarily multiplies proceedings by requiring him to pay the costs of litigation." *Calhoun*, 34 F.3d at 1296. "Punishment under this statute is sparingly applied, and 'except when the entire course of proceedings were unwarranted and should neither have been commenced nor persisted in, an award under 28 U.S.C. § 1927 may not shift the entire financial burden of an action's defense.'" *Id.* at 1297 (quoting *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir.1991)).

■ Having carefully considered the arguments raised by TCL in its motion, the court concludes that imposition of sanctions under Rule 11 or 28 U.S.C. § 1927 is not warranted. Although CNMC's Motion to Dismiss was denied by the court, CNMC's arguments were not objectively unreasonable.

**B. Attorney's Fees**

■ In its Amended Petition to Confirm Arbitration Award TCL argues that it is entitled to an award of attorney's fees. Absent statutory authorization or an agreement between the parties the "American rule" leaves each party in federal litigation to pay his own attorney's fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245–47, 261–65, 95 S.Ct. 1612, 1616, 1624–25, 44 L.Ed.2d 141 (1975); *Galveston County Navigation Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir.1996); *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1004 (5th Cir.1995). The contracts between TCL and CNMC do not provide for attorney's fees.

1. *Exceptions to the "American rule"*

■ There are exceptions to the American rule. "Courts may depart from the general rule that each party pays his own attorney's fees in 'cases involving a common fund, situations where a party has willfully violated a court order, and cases of fraudulent, groundless, oppressive, or vexatious conduct.'" *Boland*, 41 F.3d at 1004 (quoting *Holliday v. Todd Shipyards Corp.*, 654 F.2d 415, 419 (5th Cir.1981), *overruled on other grounds, Phillips v. Marine Concrete Structures, Inc.*, 895 F.2d 1033 (5th Cir.1990)). This is not such a case because CNMC has not violated a court order or engaged in any fraudulent, groundless, oppressive, or vexatious conduct.

2. *The FAA*

■ The FAA does not provide for attorney's fees to a party who is successful in confirming an arbitration award in federal court. *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir.1994). The prevailing party may nevertheless be entitled to attorney's fees in an action to confirm an arbitration award if the opponent's reasons for challenging the award are "without merit" or "without justification," or are legally frivolous, that is, brought in bad faith to harass rather than to win. *Executone Information Systems, Inc. v. Davis*, 26 F.3d 1314, 1331 (5th Cir. 1994); *Nat'l Wrecking Co. v. Int'l Brotherhood of Teamsters, Local 731*, 990 F.2d 957, 963 n. 4 (7th Cir.1993); *Colavito v. Hockmeyer Equip. Corp*, 605 F.Supp. 1482, 1488 (S.D.N.Y.1985). Because CNMC's positions are not "without merit" or "without justification," the court concludes that an award of attorney's fees is not appropriate under the FAA.

3. *The New York Convention*

■ Courts have been extremely reluctant to "superimpos[e] on the arbitra[l] process in a foreign arbitration award attorney fee applications" because they "could have a chilling effect on the arbitration process itself." *Skandia Am. Reinsurance Corp. v. Seguros Law Republica*, 1996 WL 622559, at *8 (S.D.N.Y. Sept.20, 1996). The Convention discourages signatories from imposing costs to the arbitration process that would discourage its use. *See* Convention, Art. III; *Skandia*, 1996 WL 622559, at *8 (citing Article III of the Convention). A confirming court should therefore not award attorney's fees except in the most extraordi-

nary of circumstances. *See Skandia*, 1996 WL 622559, at *8. This court concludes that the same standard fashioned by courts in evaluating requests for attorney's fees in confirmation actions under the FAA should apply. CNMC's conduct does not meet that standard.

#### 4. *The TGAA*

■ The court has concluded that the TGAA does not apply to this action. Even assuming, arguendo, that the TGAA did apply, attorney's fees are not available under the Act or other provisions of Texas law. An action to enforce an arbitration award gives rise to a new cause of action for which there is no statutory basis for recovery of attorney's fees. *See* Tex.Rev.Civ. Stat. Ann. art. 233; *Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex.App.—Houston [14th Dist.] 1994, writ denied), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995); *Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 235–36 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Kermacy v. First Unitarian Church of Austin*, 361 S.W.2d 734, 736 (Tex. App.—Austin 1962, writ ref'd n.r.e.).

#### C. Interest

TCL seeks prejudgment interest from August 15, 1995, the date the arbitration award was entered, and postjudgment interest from the date of entry of a final judgment in this case. CNMC responds that an award of prejudgment interest is not warranted and, alternatively, that if warranted, such an award should run from October 15, 1995, the deadline announced by the arbitrators for payment of the award.

#### 1. *Prejudgment interest*

■ In an action to confirm an arbitration award under the FAA Texas law governs the award of prejudgment interest where jurisdiction is based on diversity of citizenship. *Executone Information Systems, Inc. v. Davis*, 26 F.3d 1314, 1329 (5th Cir.1994). In this case, however, jurisdiction is based on a federal question, CNMC's status under the FSIA. Where a cause of action arises under a federal statute, federal law governs the scope of the remedy available to plaintiffs, including whether prejudgment interest is allowed and at what rate. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 983 (5th Cir.1991). As the *Hansen* court noted, however, that

> [s]uch a rule ... often leads back to state law. While there is a generally applicable federal statute governing postjudgment interest, *see* 28 U.S.C. § 1961(a), there is no equivalent statute governing prejudgment interest. [The defendant] would apply the rate set down in the postjudgment interest statute to awards of prejudgment interest. This Court, however, has already rejected that position: in *United States ex rel. Canion v. Randall & Blake*, 817 F.2d 1188 (5th Cir.1987), the plaintiffs in a Miller Act case sought an award of prejudgment interest. Judge Wisdom wrote for the Court that

> > [b]ecause the right that [the plaintiff] asserts in this action is provided by the Miller Act [a federal statute], the scope of the remedies afforded that right is a question of federal law. The amount of prejudgment interest is, therefore, a question of federal law. Because the Miller Act is silent on the issue, however, state law is an appropriate source of guidance. In this case, the applicable state law is that of Texas.

> *Id.* at 1193 (footnotes omitted). Like the Miller Act, ERISA is silent on the issue of prejudgment interest. Accordingly, this Court holds that when awarding prejudgment interest in an action brought under ERISA, it is appropriate for the district court to look to state law for guidance in determining the rate of interest.

*Hansen*, 940 F.2d at 984.

■ Like the Miller Act and ERISA, the FSIA (along with the FAA and the New York Convention) is silent on the issue of prejudgment interest. Following the approach approved in *Hansen* and *Canion* it is therefore appropriate to look to Texas law in determining whether prejudgment interest is appropriate. The court concludes that an award of prejudgment interest at an equitable rate of 10% compounded annually is ap-

propriate in this case. *See Hansen,* 940 F.2d at 984 (affirming the district court's award of 10% prejudgment interest). The court also concludes that prejudgment interest should run from October 15, 1995.

### 2. *Postjudgment interest*

The district court's judgment confirming an arbitral award is to have the same effect, in every respect, as in any other judgment entered by the court, and postjudgment interest is thus governed by statutory rates. 9 U.S.C. § 14; *Mantle v. Upper Deck Co.,* 956 F.Supp. 719, 739 (N.D.Tex.1997). Accordingly, the court will award postjudgment interest on the arbitration award from the date of the final judgment at the current federal statutory rate. *See* 28 U.S.C. § 1961(a); *Mantle,* 956 F.Supp. at 739–40.

### VII. *Conclusion and Order*

### A. Civil Action No. H–95–4114

In accordance with the court's conclusions that CNMC is an agency or instrumentality of the People's Republic of China subject to the FSIA's exceptions to sovereign immunity, that service of process was appropriate under the FSIA, and that the court has jurisdiction under the FAA and the New York Convention, CNMC's Motion to Dismiss TCL's Amended Petition to ·Confirm Arbitration Award (Docket Entry No. 12) is **DENIED.** Because the court has rejected CNMC's grounds for vacating the arbitration award and has concluded that TCL is entitled to an entry of judgment confirming the arbitration award under the FAA and the New York Convention, CNMC's Motion to Vacate Arbitration Award (Docket Entry No. 14) is **DENIED,** and TCL's Amended Petition to Confirm Arbitration Award (Docket Entry No. 11) and Motion for Order Confirming Arbitration Award and for Entry of Judgment (Docket Entry No. 15) are **GRANTED.** TCL's Motion for Sanctions (Docket Entry No. 79) is **DENIED,** and CNMC's Motion to Continue Discovery (Docket Entry No. 74) is **DENIED.**

### B. Civil Action No.·H–95–5553

Because in this Memorandum and Order the court has ruled on all the pending non-bankruptcy·related issues, the court's Order consolidating Civil Action No. H–95–5553 with Civil Action No. H–95–4114 (Docket Entry No. 22 in Civil Action No. H–95–4114 and Docket Entry No. 4 in Civil Action No. H–95–5553) and Order withdrawing the reference to the bankruptcy court (Docket Entry No. 2 in Civil Action No. H–95–5553) are **VACATED.** Adversary No. 95–4383 and Bankruptcy No. 88–08633–H5–1 are again **REFERRED** to the Bankruptcy Court for further proceedings consistent with this Memorandum and Order.

### C. Civil Action No. H–96–0166

CNMC has pending an arguably valid motion to remand Civil Action No. H–96–0166 to the state district court. Based on the court's rulings in this Memorandum and Order denying CNMC's Motion to Vacate in Civil Action No. H–95–4114, which is the same relief sought in H–96–0166, the court concludes that the claims raised by CNMC in the removed case have been mooted and that it would be a waste of judicial resources to require a state district judge to become familiar with the case and this court's lengthy Memorandum and Order and then, in all probability, to dismiss the case based on *res judicata.* Accordingly, Civil Action No. H–96–0166 will be dismissed with prejudice as moot.[195]

---

**195.** The court has allowed the parties extraordinary leeway in submitting numerous briefs and other written materials in connection with the pending motions. As the length of this Memorandum and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is possible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

*FINAL JUDGMENT*

In accordance with the court's Memorandum and Order, the court **ADJUDGES** that Trans Chemical Limited recover from China National Machinery Import and Export Corporation the following:

(1) $9,447,563.62,

(2) prejudgment interest on that amount at the rate of 10% compounded annually from October 15, 1995, through the date of this judgment,

(3) postjudgment interest on such amounts at the rate of 5.65% per annum, and

(4) costs of court.

This is a **FINAL JUDGMENT.**